# H. Gordon Smith et al. v. Town of St. Johnsbury and George Pratt d/b/a Northern Petroleum Co.

[554 A.2d 233]

No. 87-010

Present: Allen, C.J., Peck, Dooley and Mahady, JJ., and Barney, C.J. (Ret.), Specially Assigned

Opinion Filed September 2, 1988

*James C. Gallagher* of *Downs Rachlin & Martin*, and *Primmer & Piper*, St. Johnsbury, for Plaintiffs-Appellants.

*Swainbank, Morrissette, Neylon & Hickey*, St. Johnsbury, for Defendant-Appellee.

**Dooley, J.** On March 4, 1986, the voters of the Town of St. Johnsbury voted to change the zoning of 10.17 acres of land owned by defendant Northern Petroleum Company (Northern) at the intersection of Route 2 and Western Avenue from Rural Land-1 to Highway-Commercial. Plaintiffs, who are adjoining landowners, brought this action first to prevent the vote and then, after the vote, to invalidate the zoning change. The case was submitted to the superior court on an agreed statement of facts. The

court dismissed the complaint and plaintiffs appeal to this Court. We affirm the dismissal of the case.

In 1985, the Town of St. Johnsbury adopted a town plan which called for commercial development of lands lying near interstate highway interchange areas. Defendant Northern then made application to change the zoning applicable to the 10.17 acre lot it owned near an interstate highway interchange. The zoning of the land contiguous to the lot is either residential or Rural Land-1.

The town planning commission, after hearing, recommended to the town selectmen that the zoning of defendant's land be changed as requested. The applicable statute provides that an amendment to a zoning ordinance of an "urban municipality" can be adopted only by a two-thirds vote of the town legislative body if a written protest is filed by: "[t]he owners of forty percent of the lots or area located outside the proposed amendment but within two hundred feet from the outer limits of lots included in the proposed amendment." 24 V.S.A. § 4404(d)(3). The plaintiffs own 80% of the lots that are within 200 feet of defendant's lot. They filed a written protest. It is undisputed that St. Johnsbury is an "urban municipality" as defined in 24 V.S.A. § 4303(12) (includes, in most cases, towns of a population of 2500 persons or greater). Thus, the amendment required a two-thirds vote of the selectmen.

The town selectmen voted unanimously to reject the zoning change proposed by defendant. Defendant then circulated a petition to put the proposed zone change to a town vote and obtained signatures from in excess of five percent of the voters of the town. Relying on 24 V.S.A. § 4404(f), the selectmen voted four to one to submit the question to the voters of the town. At that point, plaintiffs brought an action seeking to enjoin the vote. An injunction was denied by the trial court and the vote went forward. The voters voted in favor of the zoning change on a vote of 939 yes and 626 no.

The town, based on the advice of its lawyers, recognized the vote as effective to change the zoning as requested. Defendant then submitted a site plan application to erect a commercial building on the property, and the plaintiffs amended their complaint to seek a declaratory judgment that the zoning change was invalid.

Both in the trial court and on appeal, plaintiffs have relied on a number of theories in support of their position that the vote did

not change the zoning or that the amendment is invalid. Their theories are as follows:

1. The statute does not permit town voters to overturn a decision of the selectmen denying a zone change.

2. If allowed by statute, the vote is unconstitutional because it allows an act taken by a super-majority of the selectmen to be overturned by a majority of the voters in an urban municipality but requires a super-majority in a rural municipality.

3. The purported amendment is invalid because it is inconsistent with the town plan.

4. The purported amendment amounts to illegal spot zoning.

We take these claims in the order presented.

An examination of the first claim requires us to set out the statutes in greater detail. Adoption of a zoning ordinance — known in the statutes as a bylaw, see 24 V.S.A. § 4303(13) — or an amendment to an ordinance begins in the planning commission of a town. 24 V.S.A. § 4403. Normally, the planning commission holds a hearing on the proposal and submits it to the legislative body of the municipality in the original or revised form together with a written report on the proposal. 24 V.S.A. § 4403(f). However, if requested by the legislative body or if the proposal is supported by a petition signed by five percent or more of the voters of the municipality, the planning commission must submit a proposed amendment, making changes only to correct technical deficiencies, to the legislative body. *Id.* Once a legislative body receives a proposed ordinance or amendment, it must hold a public hearing on the proposal and a subsequent public hearing if it decides to make a substantial change in the proposal. 24 V.S.A. § 4404(a), (b).

At this point, the procedure depends on whether the municipality is a "rural town" or an "urban municipality." In a rural town, the ordinance or amendment must be "adopted or rejected by the vote of that town" or it can be adopted by the legislative body of the town, if the voters have voted to allow this procedure. 24 V.S.A. § 4404(d). Note, if the latter method is used, the voters can rescind the action of the legislative body. See 24 V.S.A. § 1973.

In an urban municipality, as is present in this case, the ordinance or amendment is normally "adopted by a majority of the members of its legislative body." 24 V.S.A. § 4404(c). However, the normal procedure is superseded by the extraordinary majority requirement — "two-thirds vote of all members of its legislative body" — when the requisite number of surrounding landowners file a protest. 24 V.S.A. § 4404(e). This leads us to the popular vote procedure to overrule the vote of the legislative body. It provides:

> (f) Popular vote in urban municipalities. Notwithstanding subsection (c), in an urban municipality a vote on a bylaw or amendment shall not take effect if five percent of the voters of the municipality petition for a meeting of the municipality to consider the bylaw or amendment, and the petition is filed within twenty days of the vote. In that case a meeting of the municipality shall be duly warned for the purpose of acting upon the bylaw or amendment by Australian ballot.

There is one other relevant provision, effective in either rural towns or urban municipalities. It provides that if a proposal is submitted to the legislative body "under subsections (c) or (d)" and is not acted upon during the year after the date of the final hearing before the planning commission, the proposal is considered to be disapproved "unless 5 percent of the voters of the municipality petition for a meeting of the municipality to consider the bylaw or amendment." If such a petition is filed, the bylaw or amendment is put to a vote by the municipality. 24 V.S.A. § 4404(i).

■ In this case, the selectmen determined that the popular vote provision, subsection 4404(f), applied and put the amendment to a vote. Plaintiffs argue that the popular vote provision doesn't apply because: (1) by its terms, the vote procedure is an exception to subsection (c) and not subsection (e) which governed in this case because of the protest filed with the selectmen by the plaintiffs; (2) the procedure set out in subsection (e) which governed in this case because of the protest filed by plaintiffs is, by its terms, final; and (3) it does not apply where the selectmen vote down an amendment because there is no amendment to "take effect" as those words are used in subsection (f). The trial court rejected the first two arguments because it found that the statutory provisions best fit together if the popular vote provision

applied whether or not approval by the selectmen required a super-majority or a majority. It rejected the third argument because the wording of subsection (f) says it is the "vote" of the selectmen, as opposed to the bylaw or amendment, that does not take effect pending the popular vote. It found that these words were equally applicable whether the "vote" was positive or negative. We agree with the reasoning of the trial court on these points.

We start with certain canons of statutory construction. Our main purpose must be to find the intent of the Legislature based on a review of the entirety of the statutory scheme. *State* v. *Harty*, 147 Vt. 400, 402, 518 A.2d 30, 31 (1986). Where the meaning of the words chosen is plain, we must give effect to the words chosen. *Lubinsky* v. *Fair Haven Zoning Bd.*, 148 Vt. 47, 49, 527 A.2d 227, 228 (1986). In construing the statute, we must assume that the Legislature did not intend an unreasonable result. *Id.* at 50, 527 A.2d at 228.

There are actually two statutory construction issues here. The first is whether a bylaw amendment can ever be submitted to the voters after it is rejected by the selectmen. The second is whether a bylaw amendment that has been subjected to a super-majority vote of the selectmen may be submitted to the voters. On the first issue, we agree with the trial court that the better reading of the entire statutory scheme allows the town vote. Further, we think that a provision allowing an initiative or referendum by the voters of the municipality is entitled to a liberal construction in favor of allowing the vote where possible. See 5 E. McQuillin, Municipal Corporations § 16.51, at 186 (3d ed. 1981). Finally, there is no obvious reason why the Legislature would allow the citizens of a town to vote on a zoning change when the selectmen endorsed it but deny them the opportunity when the selectmen rejected the change. On this point, we emphasize that we are talking about circumstances where the interested parties have made a full record before the planning commission and the selectmen as opposed to zoning initiatives where the issues are presented to the voters in the first instance. See generally Glenn, *State Law Limitations on the Use of Initiatives and Referenda in Connection with Zoning Amendments*, 51 S. Cal. L. Rev. 265 (1977). Also, the statute we are construing applies to general policy changes or additions — for example, on the allowable set-backs or on the zoning for historic buildings — as well as zone modifications.

On the second statutory construction issue, plaintiffs rely primarily on the literal meaning of the statutory words and argue that the popular vote provision is an exception to subsection (c) — the provision on majority votes by the selectmen — and that it does not refer to subsection (e) — the provision requiring the super-majority vote of the selectmen when surrounding landowners submit a petition. On this point, we find the plaintiffs' argument to elevate literalism above fair construction. Because subsection (c) refers to the super-majority voting provision of subsection (e), we believe that a reference to subsection (c) includes a reference to all selectmen votes, including those subject to the super-majority provision under subsection (e). Even if plaintiffs' argument fit better with the statutory language, we would reject if because it confuses two distinct concepts — the first is the power of citizens to vote on a zoning change, the second is the percentage of vote necessary to make a change. We see no reason why a statutory direction on the latter concept should control whether citizens should have direct voting power over zoning changes.

By accepting the trial court's reasoning that 24 V.S.A. § 4404 permits the procedure employed in this case, we must address plaintiffs' constitutional argument. Plaintiffs argue that, under this reading of the statute, adjoining landowners in urban areas are improperly treated differently than adjoining landowners in rural areas. This is because in rural areas — when the requisite number of adjoining landowners have petitioned — a zoning by-law amendment becomes effective only if approved by two-thirds of the voters present and voting. 24 V.S.A. § 4404(e). In an urban area — by contrast — the two-thirds extraordinary voting requirement applies to the vote of the selectmen, not the citizens. And, there is the additional step — invoked here — which allows the voters to overrule the selectmen. See 24 V.S.A. § 4404(f). This step is interpreted by defendant Town as requiring only a simple majority of those voting. Plaintiffs argue that it is invidious discrimination to require a two-thirds vote of the town for a challenged zoning change in a rural area while requiring only a simple majority to accomplish the same end in an urban area.

The trial court confronted this argument and found that it is very difficult to achieve a super-majority vote where there is a large population base. Thus, it found the difference in voting re-

quirements was justified by a rough equivalence in difficulty in achieving a favorable outcome.

■ We agree with the parties that the zoning amendment passed when it was supported by a majority of those voting unless this result is unconstitutional. In the absence of a statute, the vote necessary to determine an issue is governed by the common law which gives effect to a majority vote. See *E.B. & A.C. Whiting Co.* v. *City of Burlington*, 106 Vt. 446, 175 A. 35 (1934). We have no statute governing the vote necessary to pass a zoning amendment in an urban municipality.

When, as here, no fundamental right or suspect class is involved, challenges under the equal protection clause are reviewed by the "rational basis" test. See *Colchester Fire Dist. No. 2* v. *Sharrow*, 145 Vt. 195, 198, 485 A.2d 134, 136 (1984). Under this test, distinctions will be found unconstitutional only if similar persons are treated differently on "wholly arbitrary and capricious grounds." *Id.* at 199, 485 A.2d at 136. If there is a rational basis for the distinctions, serving a legitimate policy objective, there is no equal protection violation. See *State* v. *Stewart*, 140 Vt. 389, 402, 438 A.2d 671, 677 (1981). In applying this standard, we must look at any of the purposes that are conceivably behind the statute. *Id.*

This is an area of considerable legislative discretion. There is no question that the Legislature could set the percent necessary for voter approval of a zone change at any level at or above a majority if it did so uniformly across the state. See *Town of Lockport* v. *Citizens for Community Action*, 430 U.S. 259 (1977); *Gordon* v. *Lance*, 403 U.S. 1 (1971); 8 E. McQuillin, Municipal Corporations § 25.84, at 254 (3d ed. 1983). The alleged vice in the instant case, however, is that the Legislature set the percentage necessary to prevail at one rate in rural communities and another rate in urban communities. There is, of course, no requirement that all laws governing the operation of municipal corporations be uniform statewide. In fact, the ability of communities with appropriate legislative oversight to determine their powers and the means to exercise them through charter provisions is well recognized in our law and policy. See 17 V.S.A. § 2645; see also *West Morris Regional Bd. of Educ.* v. *Sills*, 58 N.J. 464, 477, 279 A.2d 609, 616 (1971) (home rule necessarily upsets statewide uniformity and is valid). In *Missouri* v. *Lewis*, 101 U.S. 22, 31 (1879), the United States Supreme Court held:

> [T]here is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws.

The holding of *Missouri* v. *Lewis* was reaffirmed in *Salsburg* v. *Maryland,* 346 U.S. 545 (1954), a case involving differences between the admissibility of illegally-seized evidence between counties in Maryland. In holding that the state could use one evidence rule in one county and another rule in a different county, the Court emphasized: "The Equal Protection Clause relates to equality between persons as such rather than between areas." 346 U.S. at 551. See also *Griffin* v. *County School Bd. of Prince Edward County,* 377 U.S. 218, 230 (1964); *McGowan* v. *Maryland,* 366 U.S. 420, 427 (1961).

The *Lewis* and *Salsburg* cases can be interpreted to say that geographical disparity alone does not offend the equal protection clause or alternatively that regional diversity is normally enough of a rational basis to support geographical differences. We prefer the latter interpretation. The rule of *Lewis* and *Salsburg* has been most often applied to situations — like that present here — where the distinctions are based on population. The decisions are uniform that greater population and greater population density cause the need for different governmental solutions, so that distinctions based on population are valid. See, e.g., *Colt Industries, Inc.* v. *Finance Admin.,* 54 N.Y.2d 533, 545, 430 N.E.2d 1290, 1293, 446 N.Y.S.2d 237, 240 (1982) (differences in real property assessment methods based on population upheld because of "unique nature of those communities with their high density of population and diversity of property."); *Eaton* v. *State,* 363 A.2d 440, 441 (Del. 1976) (differences in grand jury vote necessary to indict between counties upheld because "[p]opulation disparity is a sufficient rational basis for the distinction . . . . "); *State* v. *Boone,* 218 Kan. 482, 489, 543 P.2d 945, 951-52 (1975) (differences in qualifications of judges between counties based on population

upheld); *State ex rel. Johnson* v. *Cady*, 50 Wis. 2d 540, 185 N.W.2d 306 (1971) (differences in parole violation procedures between counties based on population upheld as not irrational or arbitrary). In this case, the Legislature has adopted numerous differences between rural and urban municipalities in the substance and procedure of planning and zoning regulation, of which the provision in question here is only one part. See, e.g., 24 V.S.A. §§ 4382-4383. The trial court suggested one possible reason for a difference in voting requirements between urban and rural municipalities. Without endorsing that reason or any other, we think it sufficient to say that the Legislature could find that higher populations introduce new and different zoning and planning problems that warrant differences in the governmental response. Because the distinction is not arbitrary, there is no equal protection violation.

Plaintiffs ask us to apply a strict scrutiny level of review to the geographic distinctions in 24 V.S.A. § 4404. They base this request on Chapter 1, Article 7 of the Vermont Constitution and on this Court's decision in *State* v. *Ludlow Supermarkets, Inc.*, 141 Vt. 261, 448 A.2d 791 (1982). Article 7 provides:

> That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single man, family, or set of men, who are part only of that community . . . .

It is clear from the text that this provision, like the equal protection clause of the Fourteenth Amendment to the United States Constitution, is aimed at equality between persons rather than equality between areas of the state. See Mahady, *Toward a Theory of State Constitutional Jurisprudence: A Judge's Thoughts*, 13 Vt. L. Rev. 145, 151-52 (1988). We see no more reason to impose geographical homogeneity in governmental approaches under the Vermont Constitution than under the federal constitution. Thus, in this area, plaintiffs are offered no greater protection by Article 7, and the different voting rules between urban and rural municipalities are not unconstitutional under the Vermont Constitution.

Plaintiffs' last two challenges relate to the substance of the zoning change rather than the procedure by which it was adopted. Plaintiffs assert that the change is invalid because (a) it is incon-

sistent with the St. Johnsbury town plan and (b) it is improper spot zoning. We take these contentions in the above order because the compliance with the plan is a major part of the spot zoning issue.

■ The power to adopt zoning regulations in Vermont is contingent on the prior creation of the town plan. See *In re McCormick Management Co.*, 149 Vt. 585, 547 A.2d 1319 (1988). 24 V.S.A. § 4401(a) provides that "[a]ll such [zoning] bylaws . . . shall have the purpose of implementing the plan, and shall be in accord with the policies set forth therein."

The land involved in the current dispute lies along Interstate Highway 91 at an access road. The development of this highway necessarily changed the considerations that determine the appropriate use of land in the Town. In 1985, the Town of St. Johnsbury adopted a new plan which considered the effect of the interstate highway. The plan states that "potential development may justify changing the zoning designations at one or more of these accesses to Highway-Commercial." The plan goes on, however, to express concern about haphazard development in these areas and recommends the creation of a design control district in this area "which would allow the Planning Commission to review and to impose minimum design characteristics for all proposed new buildings and renovations of existing structures."

The rezoning of the land owned by Northern meets the plan in part because the land is near an interstate highway access and the zone change is to Highway-Commercial. It does not meet the plan in part because no design control district has been created so the planning commission cannot impose minimum design characteristics on new buildings beyond those applicable to buildings in Highway-Commercial districts generally.

In *Kalakowski v. John A. Russell Corp.*, 137 Vt. 219, 401 A.2d 906 (1979), this Court considered a claim that a zoning regulation was invalid, or was improperly interpreted, because it conflicted with the town plan. We announced a test of consistency as follows:

> Quite simply, partial implementation of a plan is not unusual. The plan is merely an overall guide to community development. It is a general guideline to the legislative body for its consideration of the municipality's land-use program and of the community's needs and desires. Often stated in

broad, general terms, it is abstract and advisory. Zoning by-laws, on the other hand, are specific and regulatory. Zoning is properly conceived of as the partial implementation of a plan of broader scope. It must reflect the plan, but it need not be controlled by it.

(Citations omitted). *Id.* at 225, 401 A.2d at 910.

The zone change here meets the test of consistency set forth in *Kalakowski.* The town plan contemplated the use of Highway-Commercial zoning at one or more of the interstate highway access points. It suggested certain detailed regulation that has not been adopted, at least at the present time. The details are, however, controlled by the zoning bylaws rather than the plan, and the zone change adopted by the voters can be said to be "the partial implementation of a plan of broader scope."

Plaintiffs finally argue that the rezoning of the Northern property constitutes improper "spot zoning." The scope of review of zoning ordinances is very limited. Zoning ordinances are legislative acts of a municipality that may be overturned only if "unreasonable, irrational, arbitrary or discriminatory beyond dispute." *In re Patch,* 140 Vt. 158, 176, 437 A.2d 121, 130 (1981); see also *McLaughry* v. *Town of Norwich,* 140 Vt. 49, 55, 433 A.2d 319, 322 (1981). As we recognized in *Galanes* v. *Town of Brattleboro,* 136 Vt. 235, 388 A.2d 406 (1978), one ground for invalidating a zoning classification is that it constitutes spot zoning defined as follows:

To merit that opprobrium, this sort of zoning should single out a small parcel or perhaps even a single lot for a use classification different from the surrounding area and inconsistent with any comprehensive plan, for the benefit of the owner of such property.

*Id.* at 239, 388 A.2d at 409.

The trial court relied upon *Galanes* and a leading zoning treatise to develop a three-part test of whether a zoning classification is spot zoning: (a) the use is very different from the prevailing use in the area; (b) the area involved is small; (c) the classification is not for the benefit of the community but only to provide a specific advantage to a particular landowner. See 1 N. Williams, *American Land Planning Law* § 27.02, at 563 (1974). The court

found that the rezoning in this case did not meet either the first or third part of the test and thus upheld the ordinance.

We do not have to adopt a precise definition of spot zoning to decide this case. Certainly, the elements set forth by the trial court, as well as the compliance with the town plan, will be factors in any test. See generally 2 A. Rathkopf & D. Rathkopf, The Law of Zoning and Planning §§ 28.02-28.04 (1987). Ultimately, the question must be whether the zoning classification is related "to the public health, safety, morals or general welfare." *Galanes v. Town of Brattleboro*, 136 Vt. at 240, 388 A.2d at 410.

There is certain irony in a claim that a zoning classification voted for by a majority of the residents of the town provides no benefit to the community, but instead is solely for the advantage of Northern. We will, however, treat the claim as if the zone change were adopted by the selectmen without voter involvement. The town plan contemplates some rezoning of areas near interstate highway accesses to Highway-Commercial zoning. In looking at the rezoning proposal, the planning commission noted that there was very little area in the western side of St. Johnsbury for Highway/Commercial purposes and this land was suitable for such a designation. Certainly, it would be desirable to the Town to encourage uses along the highway so that truck and other commercial traffic serving these uses would have direct access to the traffic corridor without going through other areas of town. This access would, of course, make the Town a desirable location for certain kinds of uses that would aid its tax base without drawing heavily on its resources. We think that adequate public benefit has been shown.

We also find that the conflict of uses, emphasized by the plaintiffs, is less serious than might otherwise appear. Although the new Highway-Commercial zone abuts residential zones, there is actually a very steep grade — at points a cliff — between most of the residential uses and the new zone. As the planning commission noted, there are also trees on the slope to buffer between commercial and residential uses. It appears that the rezoned area is environmentally and aesthetically part of the interstate highway corridor rather that being an island of commercial use in a residential "sea."

Finally, the one factor of spot zoning applicable to this zone change — the small size of the area — is more acceptable in this case because of the nature of the zone. The type of zoning in-

volved will be applicable only in relatively small areas right around access roads to the interstate highway. It is entirely possible that the land in question is the only land that will be eligible for this classification because other land will require that the highway traffic pass by other uses to get to the land.

For the above reasons, we find that the zoning classification is not invalid as spot zoning.

*Affirmed.*