## Ernest and Louise Choquette v. Robert and Rose Perrault

[569 A.2d 455]

No. 86-335

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed October 27, 1989

*Robert W. Davis,* Newport, for Plaintiffs-Appellees.

*Zuccaro, Willis and Bent,* St. Johnsbury, for Defendants-Appellants.

*Jeffrey L. Amestoy,* Attorney General, and *William H. Rice,* Assistant Attorney General, Montpelier, for Amicus Curiae State of Vermont.

**Gibson, J.** Defendants appeal from a superior court decision holding them liable to plaintiffs for a share of the cost of a division fence erected by plaintiffs between the parties' properties pursuant to 24 V.S.A. chapter 109 (fence law). We reverse.

I.

In 1970, defendants bought fifty acres of wooded and unoccupied land in Newport and cleared two acres, upon which they built their home. Four years later, plaintiffs bought a 310-acre parcel of land adjoining defendants' property and began pasturing a herd of cattle next to an existing division fence. Despite the fence, which was apparently in a state of disrepair, plaintiffs' livestock repeatedly escaped onto defendants' land.

With defendants' permission, plaintiffs constructed an electric fence on defendants' property in order to prevent the animals from trespassing. When that fence was destroyed, plaintiffs asked defendants to help them reconstruct the division fence and pay a proportionate share thereof. Defendants, who owned no livestock or domestic animals, refused. Plaintiffs then asked the local fence viewers to make a division of the fence pursuant to 24 V.S.A. § 3810, which they did. Once the viewers' decision was duly recorded in the town clerk's office, plaintiffs again asked defendants to build their share of the fence. Upon defendants' refusal to do so, plaintiffs built the 850 feet of fence that the viewers had assigned to defendants, and brought suit to collect the sum expended, as authorized by 24 V.S.A. §§ 3808 and 3816.

The case went to trial in early 1982, with judgment for plaintiffs. Following an appeal to this Court, the matter was remanded so that defendants could pursue the administrative remedy provided under 24 V.S.A. § 3802, which authorizes the selectmen to exempt owners of "unimproved and unoccupied land" from the fencing requirements of chapter 109.[1] *Choquette v. Perrault*, 144 Vt. 218, 475 A.2d 1078 (1984). Defendants' application for exemption was denied, and the matter was heard again in the superior court on the record of the first trial. Plaintiffs again prevailed, and it is that judgment which defendants now appeal on the ground that the Vermont fence law unconstitutionally exceeds the permissible police power of the state. Defendants rest their claim of unconstitutionality on Articles 7 and 9 of Chapter I of the Vermont Constitution, as well as Amendments 5 and 14 of the United States Constitution. We agree with defendants that, as applied to them herein, § 3802 violates Chapter I, Article 7 of the Vermont Constitution.

---

[1] 24 V.S.A. § 3802 provides that "[t]he owner of unimproved and unoccupied land adjoining occupied land of another person shall make his proportion of a fence between such lands unless the selectmen . . . decide that such owner ought not to be compelled to make any part of such fence. The decision of the selectmen . . . shall be final between the parties." Defendants had decided not to pursue that remedy, believing it to be a futile gesture.

## II.

At common law, landowners were under no affirmative duty to fence their lands unless such a duty was established by prescription or by an agreement between the interested parties. See 5 R. Powell, The Law of Real Property § 693 (1989). Rather, the common law encouraged landowners to fence their properties by creating strict liability for damages caused by trespassing animals. See, e.g., W. Keeton, Prosser and Keeton on the Law of Torts § 76 (5th ed. 1984). Ultimately, Vermont, like many other states, enacted laws to incorporate a duty to fence into the statutes. The first version of our fence law was adopted in 1780. The modern version of this law, which is very similar to the original act, is now codified in chapter 109 of Title 24.

Under the present statutory scheme, owners or occupants of adjoining lands, where the adjoining lands are actually occupied, are responsible for making and maintaining "equal portions" of the division fence between their lands. 24 V.S.A. § 3802. The owner of land which is both "unimproved and unoccupied" is likewise responsible for his portion of the division fence, unless the local selectmen on application by either party decide that he "ought not to be compelled" to contribute to it. *Id.* In that event, the owner of the adjacent occupied land "may make the whole or such part" of the fence "as is necessary to protect himself," and if the other land ever becomes occupied "so as to be benefited by such fence," that land's owner must reimburse his neighbor for his portion of the fence. *Id.* § 3803. The statutory scheme further provides that where adjoining properties do not have a division fence, neither party may pasture animals until they agree to do so without a fence, and if they fail to agree, then the fence viewers shall decide the number of animals each party may put upon the land. *Id.* § 3804.

Where the lands of two or more individuals are not required to be fenced, each of them is liable for damages caused by his animals to others' occupied lands. *Id.* § 3807. This principle is in accord with common law principles of liability for straying animals. W. Keeton, *supra*, § 76. If a person fails to maintain his portion of a division fence, however, he will be liable for damages "done to or suffered by" his neighbor "in consequence of

such neglect." 24 V.S.A. § 3808. This departure from the common law's strict liability for one's own animals has been construed as meaning that if A's livestock stray onto B's property due to B's failure to maintain his portion of the division fence, B cannot recover for any damages. See, e.g., *Scott v. Grover*, 56 Vt. 499, 501–02 (1884). In fact, in such a situation A can recover for any damages his livestock sustained while on B's property. See, e.g., *Saxton v. Bacon*, 31 Vt. 540, 546–47 (1859) (defendant liable where plaintiff's horses, which escaped onto defendant's land through portion of fence for which defendant was responsible, were gored by defendant's bull).

### III.

Plaintiffs and amicus State of Vermont both contend that Vermont's fence law is a justifiable application of the state's police power, which has been defined as "the governmental power of conserving and safeguarding the public safety, health, and welfare." *State v. Quattropani*, 99 Vt. 360, 363, 133 A. 352, 353 (1926). Relying on a "rational basis" standard, the trial court upheld the law against defendants' constitutional attacks because, in its opinion, sufficient "benefits" flow from the fence law to make it neither arbitrary nor capricious. The court found the following benefits:

(1) Freedom from unwanted intrusion by a neighbor's cattle.

(2) Freedom from trespassing neighbors and an increase in privacy.

(3) Elimination of "devil's lanes," unoccupied spaces between separate fences constructed by hostile neighbors.

(4) Diminution of lawsuits arising out of damage caused by straying cows.

(5) Discouragement of litigation by clearly marking the boundaries of rural lands.

(6) Increase in value of all land by fostering the continued vitality of agriculture.

In reaching its decision, the trial court rejected the relatively recent case of *Sweeney v. Murphy*, 39 A.D.2d 306, 334 N.Y.S.2d 239 (1972), *aff'd*, 31 N.Y.2d 1042, 294 N.E.2d 855, 342 N.Y.S.2d

70 (1973), which struck down the New York fence law. The New York law invalidated by *Sweeney* was substantially similar to the Vermont law, providing that "owner[s] of two adjoining tracts of land, except when they otherwise agree, shall make and maintain a just and equitable portion of the division fence between such lands." *Id.* at 307, 334 N.Y.S.2d at 240. In that case, plaintiffs resided on 158 acres of land, of which they cultivated ten acres; they kept no livestock. Defendants operated an adjoining dairy farm and grazed 110 milk cows. The parties shared a common boundary 2200 feet in length.

In holding the New York fence law unconstitutional, the court stated that despite the presumption of the statute's validity,

> "[A] statute whose effect is to curtail the liberty of individuals to live their lives as they would and whose justification is claimed to lie in the exercise of the police power of the State must bear a reasonable relationship to, some proportion to, the alleged public good on account of which this restriction on individual liberty would be justified."

*Id.* at 308, 334 N.Y.S.2d at 241 (quoting *Fenster v. Leary*, 20 N.Y.2d 309, 314, 229 N.E.2d 426, 429, 282 N.Y.S.2d 739, 743 (1967)). Even assuming a benefit to the general public, the court held that requiring one landowner who does not keep livestock to share the cost of a fence for his neighbor's benefit was "not reasonably necessary to any legitimate public purpose" and was "oppressive." *Id.* at 308, 334 N.Y.S.2d at 242.

While defendants herein argue for the applicability of the New York court's analysis in *Sweeney v. Murphy*, plaintiffs and amicus point to the case of *Glass v. Dryden*, 18 Ohio St. 2d 149, 248 N.E.2d 54 (1969), as support for the trial court's decision. They contend that under the analysis set forth in that case, defendants received a benefit from the fence sufficient to withstand constitutional attack. In *Glass*, the Ohio Supreme Court denied plaintiff an injunction against the actions of that state's equivalent of fence viewers in assigning shares of partition fences to neighboring landowners. The court held that the plaintiff had failed to prove that the cost of compliance with the payment order would exceed the difference between her land's

value before and after the installation of the fence. *Id.* at 151, 248 N.E.2d at 55-56.

We find *Glass* to be inapposite. *Glass* did not entail a constitutional challenge to the entire scheme of Ohio's fence law. See *id.* at 150, 248 N.E.2d at 55 ("The principal issue in this case is confined to a narrow corridor. Appellee has never urged, nor did the Court of Appeals hold, that [Ohio's fence law] is invalid *per se* . . . ."). Instead, plaintiff sought an injunction against the actions of the local officials based on what she claimed to be a lack of any benefit to her property. Thus, we see nothing in the *Glass* decision which limits this Court's traditional constitutional analysis.

## IV.

Our first task is to ascertain the proper standard against which to measure the challenged law's constitutionality under the Vermont Constitution. Absent the involvement of a fundamental right or a suspect class, a legislative enactment is presumed to be constitutional, see *Smith v. Town of St. Johnsbury*, 150 Vt. 351, 357, 554 A.2d 233, 238 (1988); *Choquette v. Perrault*, 144 Vt. at 222–23, 475 A.2d at 1081; however, "the police power is not limitless, even though it be but another name for sovereignty itself. It is subject to judicial review to test the reasonableness and appropriateness of the legislation to accomplish the result intended without oppression or discrimination." *Vermont Woolen Corp. v. Wackerman*, 122 Vt. 219, 224, 167 A.2d 533, 537 (1961). A statute will be constitutionally valid so long as the law's public purpose is "paramount and the enactment reasonably related to that purpose." *Id.* at 226, 167 A.2d at 538.

In *Vermont Woolen*, a property owner challenged the classification of a certain watercourse, claiming that the classification statute offended Chapter I, Article 7 of the Vermont Constitution, which declares:

> That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or

advantage of any single man, family, or set of men, who are a part only of that community . . . .

This Court upheld the classification, pointing out that although the statute could result in burdensome costs to certain property owners, it was reasonably related to a public purpose—the abatement of water pollution—and therefore neither exceeded the state's police power nor violated Article 7. *Vermont Woolen*, 122 Vt. at 226–28, 167 A.2d at 537–39.

■ More recently, in *State v. Ludlow Supermarkets, Inc.*, 141 Vt. 261, 448 A.2d 791 (1982), we again assessed the validity of a law as against the provisions of Article 7. In that case, this Court noted that the explicit, statutory preference bestowed on small retail stores by the Sunday closing law was "totally irreconcilable" with Article 7, since it did not serve "an appropriate and overriding public interest," nor did the State establish that the infringement of the rights of the citizens was merely incidental and that the objectives of the law could be reached in no other way. *Id.* at 268–70, 448 A.2d at 795–96. Nonetheless, we have reiterated in subsequent decisions that when no fundamental right or suspect class is involved, state law need only reasonably relate to a legitimate public purpose in order to be a valid enactment under the state's police powers. See *In re One Church Street*, 152 Vt. 260, 262–65, 565 A.2d 1349, 1350–51 (1989); *Smith v. Town of St. Johnsbury*, 150 Vt. at 357, 554 A.2d at 238; cf. *Alexander v. Town of Barton*, 152 Vt. 148, 157–58, 565 A.2d 1294, 1299–1300 (1989) (validity of governmental action under proportional contribution clause, Chapter I, Article 9 of Vermont Constitution, analyzed under rational-basis test).

The test, then, in determining a law's constitutionality under Article 7 when no fundamental right or suspect class is involved, is whether the law is reasonably related to the promotion of a valid public purpose. Employing this standard of review, we hold that 24 V.S.A. § 3802 is unconstitutional as applied to persons who own no livestock.

Notwithstanding the trial court's effort to identify potential benefits accruing to the public and to adjoining landowners without livestock, the simple truth is that the fence law was

enacted primarily to benefit landowners with livestock. One need only look at the plain language of the provisions of the law to verify this fact:

> Fences four and one-half feet high, in good repair and so constructed as to prevent the escape of sheep . . . shall be deemed sufficient . . . . A person driving cattle, sheep, swine or other stock upon a highway, and exercising reasonable care, shall not be liable for damages by reason of the escape of such animals into an enclosure . . . unless the [enclosure's] fence . . . is a sufficient fence . . . .

24 V.S.A. § 3801. The argument that a landowner without livestock benefits to the extent that he or she is protected by straying livestock is delusive, considering the fact that, absent the statute, the liability for trespassing livestock lies solely with the owner of the livestock.[2] See W. Keeton, *supra*, § 76; see also *Alma Coal Co. v. Cozad*, 79 Ohio St. 348, 355, 87 N.E. 172, 173 (1909) ("The powers of the imagination will be exhausted in vain to find a member of society who will be benefited by the imposition which is sought to be made . . . , except . . . the adjoining proprietor who desires to enclose his land.").

In the context of the land-use patterns of the nineteenth century, Vermont's fence law served the broad public interest. Though not all Vermonters were engaged in agricultural pursuits, the land was predominantly open and farmed, and most rural landowners were also livestock owners.[3] This is not the case today. Much of the open farmland that existed at the turn of the century has reverted to woodlands[4] or otherwise been developed. We can no longer assume that the fence law affects

---

[2] We also note that alleviation of the problem of "devil's lanes" directly benefits landowners with livestock. The principal problem with "devil's lanes" is that livestock become trapped between two fences built in close proximity. See *Alma Coal Co. v. Cozad*, 79 Ohio St. 348, 356, 87 N.E. 172, 173 (1909).

[3] See H. Wilson, *The Hill Country of Northern New England: Its Social and Economic History 1790–1930*, at 346–80 (1936).

[4] Between 1900 and 1930 one-fourth of the farms in Vermont were given up and the amount of improved land decreased by 34%. See H. Wilson, *supra*, at 346–47. Between 1950 and 1982 land area in farms further decreased by 34%. *U.S. Dep't of Commerce, 1982 Census of Agriculture: Vermont*, vol. 1 Geographic Area Series, part 45.

livestock owners almost exclusively. As a result of changing land-use patterns, the law more and more often applies to land-owners without livestock. In such situations, the fence law is burdensome, arbitrary and confiscatory, and therefore cannot pass constitutional muster.

We intend neither to disparage the rural industries in Vermont nor to handcuff state government when it desires to aid vital, economic interests of the state. The state may tax or regulate the general populace to benefit key sectors of the economy. Indeed, virtually all regulatory statutes have disparate effects on various sectors of the public. *State v. Ludlow Supermarkets, Inc.*, 141 Vt. at 265, 448 A.2d at 793. But when a specific class of persons is benefited at the expense of a few private individuals who find themselves ensnared by a law not intended for them, then that law is no longer reasonably related to the promotion of a public purpose. Cf. *In re Meserve*, 120 N.H. 461, 464, 417 A.2d 11, 13 (1980) (Public Utilities Commission order requiring private railroad to pay for construction of crossing in order to allow private store access to street held unconstitutional, as it required the expenditure of money by a private person for the benefit of another private person without a justifying public purpose of sufficient magnitude).

We agree with the rationale stated in *Sweeney* that "requiring an adjoining owner ... who does not keep livestock, to share the cost of [a] fence for the benefit of [a] neighbor is not reasonably necessary to any legitimate public purpose and is oppressive." 39 A.D.2d at 308, 334 N.Y.S.2d at 242. The police power as applied to defendants does not today legitimately further the statute's purpose of clarifying the obligations and liabilities of adjoining landowners with respect to their livestock.

As we recognized in *State v. Auclair*, 110 Vt. 147, 159, 4 A.2d 107, 112 (1939) (quoting *State Board of Milk Control v. Newark Milk Co.*, 118 N.J. Eq. 504, 519, 179 A. 116, 124 (1935)), "'[c]ircumstances may so change in time or so differ in space as to clothe with a public interest what at other times would be a matter of purely private concern.'" This case presents us with the converse of that axiom. The law can no longer, as a result, withstand constitutional attack under Chapter I, Article 7 of

the Vermont Constitution when applied to landowners without livestock.

*Reversed with directions to enter judgment in favor of defendants.*