# Gail MacCallum v. Philip Seymour's Administrator, Janet Seymour

[686 A.2d 935]

No. 95-233

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed September 13, 1996

*Sandra E. Levine* of *Cheney, Brock, Saudek & Mullett, P.C.*, Montpelier, for Plaintiff-Appellant.

*Kenneth Appel*, St. Albans, for Defendant-Appellee.

*Jeffrey L. Amestoy*, Attorney General, *William H. Rice*, Assistant Attorney General, and *Albert H. Coons, Jr.*, Montpelier, for Intervenor State of Vermont.

**Dooley, J.** In this case, we are required to decide whether 15 V.S.A. § 448, which denies an adopted person's right of inheritance from collateral kin, is constitutional. We conclude that the statute violates the common benefits provision of the Vermont Constitution, Chapter I, Article 7, and reverse the summary judgment granted by the Franklin Superior Court.

The parties are sisters. Plaintiff Gail MacCallum is the daughter of Anita Murphy Seymour and the adopted daughter of Richard Seymour, who married plaintiff's mother after the death of plaintiff's father. Plaintiff was adopted in 1952, when she was seven years old, one year after her mother's remarriage. During that same year, defendant Janet Seymour was born of Richard and Anita Seymour, and the sisters grew up together as part of the Seymour family.

Richard Seymour died in 1980. In 1994, his brother, Philip Seymour, died intestate leaving no children, spouse or parents. Both parties sought to share in the Philip Seymour estate as "legal representatives of [the] deceased brother" of the decedent. The Franklin Probate Court, and thereafter the Franklin Superior Court, concluded that plaintiff could not share in the estate because of the provisions of 15 V.S.A. § 448:

> Upon the issuance of a final adoption decree the same rights, duties and obligations, and the same right of inheritance shall exist between the parties as though the person adopted had been the legitimate child of the person or persons making the adoption . . . . The same right of inheritance shall exist between the person adopted and his issue on the one hand and natural or adopted children of the person or persons making the adoption and their issue on the other hand as though the person adopted had been the legitimate child of the person or persons making the adoption. However, *there shall be no right of inheritance between the person adopted and his issue on the one hand and predecessors in line of descent and collateral kin of the*

*person or persons making the adoption on the other hand. . . .*

(Emphasis added.) Plaintiff does not challenge this construction of the statute. Thus, the only question before us is whether the emphasized language of § 448 is constitutional, when applied to a person who was adopted as a child.

Before we look at the legal standards that govern this challenge, it is helpful to look further at the statutory scheme and at the changing nature of adoption within Vermont and the United States as a whole. Much of the history of the statutory scheme is set out in our recent decision in *In re Raymond Estate*, 161 Vt. 544, 641 A.2d 1342 (1994). The first statute dealing directly with the inheritance rights of adopted persons was enacted in 1880. 1880, No. 137, § 6. It provided that "the same right of inheritance shall exist between the parties as though the person adopted had been the legitimate child of the person or persons making the adoption." *Id.* This Court interpreted the statute narrowly in *In re Walworth's Estate*, 85 Vt. 322, 333, 82 A. 7, 11 (1912), to allow the adopted person inheritance rights only from the adopting parents. Thus, under the 1880 statute an adopted person had no right of descent from siblings or next of kin in the adoptive family.

In 1945, the statute was amended to allow an adopted person to inherit by descent from "the natural or adopted children of the person or persons making the adoption and their issue." 1945, No. 41, § 18, codified as 15 V.S.A. § 448. At the same time, the Legislature explicitly denied inheritance by descent from "predecessors in line of descent and collateral kin of the person or persons making the adoption." *Id.* In 1996, the statute was replaced with a new codification of adoption law which eliminates any distinction between adopted persons and natural children with respect to the inheritance rights in the adopting family. See 15A V.S.A. § 1-104(1) (effective July 1, 1996).

The 1945 and 1996 recodifications of the adoption laws embodied increased inheritance rights of the adopted person within the adopting family. This liberalization occurred, however, within the context of a restrictive statutory scheme. In a 1966 study, only a few states had explicitly restricted the inheritance rights of adopted persons within the adopting family. See Comment, *Intestate Succession, Sociology and the Adopted Child*, 11 Vill. L. Rev. 392, 396 (1966) (eight states). In a few others, the relevant statute was silent and court decisions restricted inheritance rights of adopted persons. See *id.* at 397. In the vast majority of states, the inheritance rights of adopted persons

were identical to those of natural children within the adopting family. Indeed, the modern trend has been to do away with such restrictions, and the scholarly writings are nearly unanimous in support of this policy. For example, speaking of the Vermont statute, one legal commentator concluded, "The discrimination against the adoptee that occurs in Vermont . . . is bound to retard [the] . . . goal [of making him a full fledged member of his new family] by making the adopted child feel like a second-class family member," and generally described the adopted person's situation as that of "a two-headed freak." J. Rein, *Relatives by Blood, Adoption, and Association: Who Should Get What and Why*, 37 Vand. L. Rev. 711, 722, 806 (1984).

We also find relevant the changing nature of adoption in American and Vermont society. When the Legislature first spoke on the inheritance rights of adopted persons, adoption was rare and was largely unregulated. Once the parties to the adoption signed the proper instrument, the adoption was automatic as long as the probate court found "the law has been complied with." 1906 P.S. § 3270.

By 1945, the year after the first liberalizing recodification, there were 223 adoption petitions in Vermont. Vermont Dep't of Pub. Welfare, Biennial Report 1946-47, at 19 (1947). The number of petitions grew to 520 per year in 1987. See V. Flango & C. Flango, The Flow of Adoption Information from the States, at 19 (Nat'l Center on State Courts 1993). In fiscal year 1996, 532 adoption petitions were filed. R. Squires, Quarterly Caseflow Statistics for the Quarter Ending June 30, 1996, at 13 (Supreme Court of Vermont July 22, 1996). This growth mirrors national trends.

The nature of an adoption proceeding has changed greatly over the years. The 1945 legislation, for example, introduced the requirement, for adoption of minors, of an investigation of the adopting home by the department of public welfare or a licensed child-placing agency and a one-year trial period in which the child lives in the adopting home under the supervision of the department or the licensed child-placing agency. 1945, No. 41, §§ 6, 7. Public regulation has been introduced to ensure that the adoption is in the best interests of the child. See *In re B.L.V.B.*, 160 Vt. 368, 371, 628 A.2d 1271, 1273 (1993).

Some of the increase in frequency of adoption can be attributed to situations, like that present here, where a stepparent adopts a stepchild. Increasing divorce rates and numbers of children born out of wedlock have made such adoptions more common in recent years. See Comment, *Intestate Succession and Stepparent Adoptions: Should Inheritance Rights of an Adopted Child be Determined by Blood or by Law?*, Wis. L. Rev. 321, 340-41 (1988).

The attitudes toward adopted children have also changed. The English common law did not recognize adoption. See L. Huard, *The Law of Adoption: Ancient and Modern*, 9 Vand. L. Rev. 743, 747 (1956). Moreover, English law based descent and distribution solely on the principle of consanguinity, that is, the bloodline. This heritage greatly influenced the reactions of American courts to descent and distribution issues for adopted persons. For example, in 1925, the New Mexico Supreme Court wrote:

> Throughout the statutes of the several states consanguinity is fundamental in legislative fixing of descent and distribution of property. True, the subject is one of legislative will; but legislation repudiating or eliminating blood relationship from the descent of property would be so abhorrent to every incident of our home and family life as to meet with general disapproval. The courts should depart from this elemental guideship only when forced to do so by an inexorable statutory demand. Our statute is inexorable in its demand that the estate of one dying shall go to his kindred; those of his blood, flesh of his flesh, bone of the bone. To such kindred, . . . and only to those who are kin, those of the same blood, does the chapter anywhere extend . . . . The statute on adoption must be read into the statute of distribution and descent, but it is to be read in only to effectuate the precise terms of the statute on adoption . . . .

*Dodson v. Ward*, 240 P. 991, 993 (N.M. 1925). This Court reflected a similar attitude in 1924 when we stated of adopted persons that "strangers in blood, having no moral claim whatever based on kinship, may be legally placed in a class by themselves." *In re Estate of Hagar*, 98 Vt. 235, 240, 126 A. 507, 509 (1924). In contrast, in 1977, the West Virginia Supreme Court found that the terms of a 1938 trust instrument covered adopted children, reasoning:

> While there may be testators and trustors who are so concerned with medieval concepts of "bloodline" and "heirs of the body" that they would truly be upset at the thought that their hard-won assets would one day pass into the hands of persons not of their blood, we cannot formulate general rules of law for the benefit of eccentrics.

*Wheeling Dollar Sav. & Trust Co. v. Hanes*, 237 S.E.2d 499, 503 (W. Va. 1977). As discussed below, the earlier attitudes to descent and

distribution issues paralleled a view of adopted children as a lower class than natural offspring.

██ Plaintiff has challenged the denial of her right to inherit from her uncle under both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Chapter I, Article 7 of the Vermont Constitution, which provides:

> That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community . . . .

We choose to decide the case under Article 7.

Unless a fundamental right or suspect class is involved, the inquiry under Article 7 is whether the statute is reasonably related to the promotion of a valid public purpose.[1] See *Lorrain v. Ryan*, 160 Vt. 202, 212, 628 A.2d 543, 550 (1993). Thus, "[a] statute is unconstitutional, as applied, if it treats similarly situated persons differently and the different treatment does not rest upon some reasonable consideration of legislative policy." *Oxx v. Department of Taxes*, 159 Vt. 371, 376, 618 A.2d 1321, 1324 (1992). Here, the two similarly situated sisters are treated differently; the question is whether the difference rests on a reasonable consideration of legislative policy.

Defendant and the Attorney General, as intervenor, rely on two policies to validate the different treatment: (1) the Legislature could presume that the intent of collateral relatives was that their property would pass only within the bloodline; and (2) the adoption of plaintiff represented a contract between her and her adoptive father that did not affect the interests and expectations of others. In making these arguments, both draw heavily on the opinion of the Georgia Supreme Court in *Nunnally v. Trust Co. Bank*, 261 S.E.2d 621 (Ga. 1979), *cert. denied*, 445 U.S. 964 (1980), which upheld a Georgia statute that allowed an adopted person to inherit only from the adopting parents and provided, "To all other persons the adopted child shall stand as if no such act of adoption had been taken." *Id.* at 623 (quoting 1941 Ga. Laws 305-06). The court upheld the statute, reasoning:

---

[1] Plaintiff has argued that adopted persons are a suspect class and our standard of review of the statute should be more active. In view of our disposition, we do not reach this argument.

One aim of this statute is the state's interest in providing for the orderly disposition of property. Through its laws of intestate succession, the state has established a method of descent based upon the presumed intention of the decedent. Distinctions based on preferences do exist in this area of law. It is presumed, by the state, that a person would wish for his or her property to pass within his or her bloodline, for example, and to children before grandchildren, and so forth. As long as these distinctions are rationally related to the state's interest in seeking the most orderly system possible for passing title to property from one person to another so that the state knows at all times exactly what is owned by whom, then the distinctions are constitutionally sound.

. . . .

. . . However, the state assumes that one would rather have his or her property pass within the bloodline rather than have people with a bare legal relationship to them share. We would consider this assumption a rational means to dispose of property in an orderly fashion.

. . . The sole question is whether this assumption on the part of the state is one rational way to achieve the orderly disposition of property. We conclude that it is.

*Id.* at 623-24.

■ For two primary reasons, we decline to follow the rationale of the Georgia court and conclude that presumed intent is not a reasonable consideration of legislative policy. The effect of the presumed-intent rationale is to make statutory discrimination lawful as if it were private discrimination. As plaintiff emphasizes, the rationale would as easily validate racial discrimination in addition to validating discrimination against adopted persons.

The United States Supreme Court has been unwilling to rely on presumed intent to validate descent and distribution laws that prevent illegitimate children taking property by intestate succession. See *Trimble v. Gordon*, 430 U.S. 762, 775 n.16 (1977). The Court reasoned:

Appellees characterize the Illinois intestate succession law as a "statutory will." Because intent is a central ingredient in the disposition of property by will, the theory that

intestate succession laws are "statutory wills" based on the "presumed intent" of the citizens of the State may have some superficial appeal. The theory proceeds from the initial premise that an individual could, if he wished, disinherit his illegitimate children in his will. Because the statute merely reflects the intent of those citizens who failed to make a will, discrimination against illegitimate children in intestate succession laws is said to be equally permissible. The term "statutory will," however, cannot blind us to the fact that intestate succession laws are acts of States, not of individuals. Under the Fourteenth Amendment this is a fundamental difference.

Even if one assumed that a majority of the citizens of the State preferred to discriminate against their illegitimate children, the sentiment hardly would be unanimous. With respect to any individual, the argument of knowledge and approval of the state law is sheer fiction. The issue therefore becomes where the burden of inertia in writing a will is to fall. *At least when the disadvantaged group has been a frequent target of discrimination, as illegitimates have, we doubt that a State constitutionally may place the burden on that group by invoking the theory of "presumed intent."*

*Id.* (citations omitted) (emphasis added). "The Constitution cannot control [private] prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

We believe this reasoning applies here. "[P]resumed intent . . . is an unacceptable justification for a decision by the state which the state would otherwise be unable to justify." *Eskra v. Morton*, 524 F.2d 9, 14 (7th Cir. 1975). Although testators may make irrational and discriminatory choices in the distribution of their property, "when the choice is made by the government, the obligation to afford all persons equal protection of the laws arises." *Id.*

Adopted persons have historically been a target of discrimination. See Comment, *Adoptees' Equal Protection Rights*, 28 UCLA L. Rev. 1314, 1334-39 (1981). In the years following the legalization of adoption, "the adopted child was expected to work harder than a natural child and to repay his debt of gratitude." *Id.* at 1336, n.132 (quoting B. Tizard, *Adoption: A Second Chance* 5 (1977)). Even adopting parents frequently view adopted children as inferior to

natural children. See Comment, 28 UCLA L. Rev. at 1337-38. The message of § 448 is invidious and discriminatory: "He is a member of the family, yet he is not, and the realization of this fact by him and other members of the family leaves an area of rejection which is, in many instances, more important psychologically than is concern over material values." *In re Smith's Estate*, 326 P.2d 400, 403 (Utah 1958) (Crockett, J., dissenting).

We also conclude that presumed intent is an outdated rationale that is not reasonable today. Equal treatment issues are often exacerbated by the passage of time. In *Choquette v. Perrault*, 153 Vt. 45, 569 A.2d 455 (1989), we confronted this problem in ruling on the validity of Vermont's fence viewer statute under Article 7. The statute in *Choquette* provided that adjoining landowners were responsible for the cost and maintenance of a division fence between the properties to prevent the migration of animals across the boundary. It allowed one landowner to construct the fence and force the adjoining owner to share in its cost. In *Choquette*, the plaintiff, who maintained a herd of cattle, built the fence and sued the defendant, the adjoining land-owner who had no domestic animals, for part of the cost. In holding the statutory scheme unconstitutional in violation of Article 7, we noted:

> In the context of the land-use patterns of the nineteenth century, Vermont's fence law served the broad public inter-est. Though not all Vermonters were engaged in agricultural pursuits, the land was predominantly open and farmed, and most rural landowners were also livestock owners. This is not the case today. Much of the open farmland that existed at the turn of the century has reverted to woodlands or otherwise been developed. We can no longer assume that the fence law affects livestock owners almost exclusively. As a result of changing land-use patterns, the law more and more often applies to landowners without livestock. In such situations, the fence law is burdensome, arbitrary and confiscatory, and therefore cannot pass constitutional mus-ter.

*Id.* at 53-54, 569 A.2d at 460.

The situation here is much like that in *Choquette*. In 1880, or even in 1945, the Legislature might have concluded that collateral kin would expect intestate succession to be limited to the bloodline and exclude adopted persons. That presumption is no longer reasonable in

1996. We no longer rely on antiquated notions of the adoptive relationship as "'a civil or contractual, an artificial, as contradistinguished from a natural status.'" *In re Raymond Estate*, 161 Vt. at 548, 641 A.2d at 1345 (quoting *Weber v. Griffiths*, 159 S.W.2d 670, 674 (Mo. 1942)). We must acknowledge the vast cultural and social changes that have occurred and their effect on adoption practice and the public attitudes about adoption. See *B.L.V.B.*, 160 Vt. at 376, 628 A.2d at 1276 ("our paramount concern should be with the effect of our laws on the reality of children's lives").

The rationality of the statutory scheme is further eroded by its treatment of inheritance rights with respect to collateral kin of the natural parents of an adopted person. Nothing in the relevant statutory scheme suggests these rights are affected by a termination of a natural parent's rights and the subsequent adoption of a person. Thus, we are asked to accept that it is the presumed intent of collateral kin in the former family of the person that inheritance go to that person, but it is not the presumed intent of collateral kin in the current family of the person that the person can take by intestate succession.[2] We find the proposition irrational.

Without the logic of presumed intent, the argument that discrimination against adopted persons in intestate succession produces "the orderly disposition of property," *Nunnally*, 261 S.E.2d at 623, has no force. Property distribution is no less certain or orderly because adopted persons must share in that distribution.

■ Defendant's second justification for the discrimination produced by § 448 is that collateral or lineal relatives did not consent to the adoption. Defendant contends that the adoption "contract" creates a legal relationship between the adoptive parents and the adopted child, but that the contract cannot bind those adoptive relatives who did not have any say in the adoption. See *In re Eddins' Estate*, 279 N.W. 244, 246 (S.D. 1938) (adoption statute interpreted as creating contractual relationship that limits "mutual rights and duties created by the adoption to the adopted child and the adopting parents, so that the right of inheritance cannot extend to any of the heirs either lineal or collateral of the adoptive parents"); F.

---

[2] We recognize that the rationality of this proposition is greater with respect to an in-family adoption, as occurred here. The parental rights of plaintiff's mother were not terminated, and plaintiff has presumably maintained contact with the collateral kin of her mother and natural father. Nevertheless, the statute fails to distinguish between in-family adoptions and others. The new statute modifies this rule. See 15A V.S.A. § 1-105(a).

Kuhlmann, *Intestate Succession by and from the Adopted Child*, 28 Wash. U. L.Q. 221, 235 (1943).

We find this justification meritless. Whether or not an adoptee has some "contractual" relationship with her adoptive relatives is completely irrelevant to the question before us. See *In re Raymond Estate*, 161 Vt. at 548, 641 A.2d at 1345. The argument that adoptees should not inherit from adoptive relatives who were not parties to the adoption contract "ignore[s] the fact that a child's birth always imposes a potential heir on the relatives of his biological parents, yet no one would suggest that the child should not inherit from his blood relatives because they had not consented to his conception." J. Rein, 37 Vand. L. Rev. at 721. Under the intestate succession statute, the existence of a legal duty or obligation is not the basis upon which relatives inherit from their kin.

The contractual theory is merely another way of reformulating the argument that an adoptee cannot inherit for lack of consanguinity with her adoptive kin. Accepting the premise of the theory, the adopted person has parents, but does not have siblings, grandparents or uncles, aunts, and cousins. The contractual theory rests on the same impermissible premise undergirding defendant's presumed-intent argument: that the adopted child is a second-class member of her adoptive family.

After examining the two rationales proffered to validate the statute, we conclude that it is not reasonably related to a valid public purpose, at least with respect to persons who are adopted during their minority. We recognize that the situation may be "entirely different in the case of one adopted after attaining the age of majority," *In re Estate of Hagar*, 98 Vt. at 240, 126 A. at 509, and expressly do not rule on the constitutionality of the statute in that context.

The superior court's decision to grant summary judgment for defendant and deny it to plaintiff was erroneous.

*Reversed; judgment is hereby entered for plaintiff. 15 V.S.A. § 448 is held to be unconstitutional insofar as it denies adopted children the right to inherit from collateral heirs, and plaintiff Gail MacCallum is declared to be a lawful heir to the estate of Philip Seymour.*