**In re Zoning Permit Application of Clyde and Marlene Patch and In re Land Use Permit Application of Clyde M. Patch**

[437 A.2d 121]

No. 334-79

Present: Barney, C.J., Larrow, Billings and Hill, JJ., and Daley, J. (Ret.), Specially Assigned

Opinion Filed September 1, 1981

Motion for Reargument Denied October 26, 1981

162

*Smith, Harlow & Liccardi,* Rutland, for Plaintiffs.

*M. Jerome Diamond,* Attorney General, and *Benson D. Scotch* and *Merideth Wright,* Assistant Attorneys General, Montpelier, for State.

*Keyser, Crowley, Banse & Kenlan,* Rutland, for Town of Wallingford, Wallingford Planning Commission, and Wallingford Board of Adjustment.

*S. Scott Smith* of *Carroll, George, Hill & Pratt,* Rutland, for adjoining landowners.

Barney, C.J. This case involves a proposed sanitary landfill dump. The Patches, in the course of seeking the necessary permits, had mixed success. Starting in 1977 in the Town of Wallingford the Patches applied for site plan approval and

for a conditional use permit. The appropriate agencies, the Wallingford Planning Commission in the case of the site plan and the Wallingford Board of Adjustment in the case of the conditional use permit, denied the respective applications. Both of these decisions were appealed to Rutland Superior Court under 24 V.S.A. §§ 4471, 4472 and 4475.

Clyde Patch also applied to the district environmental commission for a land use permit. He was opposed by the Town of Wallingford and by various landowners. Here he was more successful and was given his permit, but the granting of the land use permit was appealed to the Environmental Board by the Town of Wallingford. Under 10 V.S.A. § 6089(a), Patch removed this appeal to the Rutland Superior Court.

The Rutland Superior Court tried all of these matters together in a de novo proceeding January 23 to 31, 1979. Since some of the parties, as adjoining landowners, are only eligible to participate in part of the proceedings, their appeals relate only to issues raised by the zoning proceedings. See 24 V.S.A. § 4472(c) and 10 V.S.A. §§ 6085(c) and 6089(b). The Patches sought reversal as to the zoning and conditional use permits; the Town of Wallingford was in the equivalent position as to the land use issue. In September, 1979, the court issued extensive and detailed findings and filed a judgment order denying both the zoning application and the land use permit. The site plan approval issue was not dealt with. The matter was appealed to this Court by the Patches, and the Town of Wallingford filed a cross-appeal which contended that the land use permit should have been denied on an additional ground relating to pollution of wells and ground water by toxic wastes.

The appeals raise a great many issues, most of them dealing with the relation of legal standards involved in this sort of controversy to very specific aspects of terrain, location, visual effects and the like. On that account, for full understanding of the litigation, a somewhat extended description of the site, its environs and the relationship among various property holdings is undertaken here.

The Town of Wallingford lies 10 miles south of the City of Rutland on U.S. Route 7. It is located in the valley of the Otter Creek, and the built-up village area is to the east of the creek. That stream flows north through Rutland and Mid-

dlebury, eventually turning at Vergennes and flowing into Lake Champlain. In the Wallingford area the drainage is essentially down the hills on the east and west sides of the valley into the Otter.

Directly across from the village, on the west side of the creek, is the large Whitcomb gravel pit and asphalt plant. Directly north of that is the Tarbell gravel pit. Both of these areas are just west of a road that crosses from the village and runs north parallel to Otter Creek. There is an interval of fairly open land and then there is a third gravel pit, also on the west side of the road.

This road is known as Creek Road. On its easterly side there are a number of residences, becoming more scattered and including some farm properties as one moves north along the road. On the road, just north of Wallingford's town line and in the neighborhood of a mile north of the proposed landfill, in the Town of Clarendon, is Wallingford's previous dump site, now closed by injunctive order for failure to comply with state law and the ordinances of the Town of Clarendon. That order indicated that the Wallingford dump had been operated as an open dump, in violation of law, for nine years in spite of state efforts to get it relocated. Wallingford sought to have it sited in Clarendon in spite of an ordinance of that town forbidding nonresidential dump sites. Wallingford unsuccessfully argued that the restriction was unconstitutional and ultra vires. Since the adverse decision Wallingford residents have been taking their refuse to a private, unapproved dump in Danby. A suit has been brought against the owners to close it.

To the southeast of the proposed project, on the east side of Creek Road, are residences. Some of the owners are opposing parties here. On the east bank of the creek north of the bridge over the creek and opposite the general area involved in the project is the Wallingford sewage plant.

During the period that the Town of Wallingford was being urged by the state to close its open dump and turn to a landfill operation, Clyde Patch was approached, in 1975 and again in 1976, by selectmen of the town, who inquired as to whether he had land available suitable for a town dump. When suit was instituted to close the dump in Clarendon as a nuisance, Patch then filed his zoning application with the town officials

and his application for a land use permit under Act 250 with the district environmental commission.

Mr. Patch is a lifelong resident of Wallingford and for twenty-two years operated the 172 acre farm on which the landfill is proposed to be located. At the time of his applications he discontinued farming and leased the farm, except for an area where he operates a wood business and the five acres reserved for the landfill, to a tenant who has a dairy operation. Patch does have a landfill permit for a swampy area east of Creek Road where he deposits wood waste and sawdust.

Turning to the landfill proposal itself, it is not of large dimension. It is designed to serve about six thousand people for ten years. This would include Clarendon and Danby residents, as well as those of Wallingford. At the end of ten years it is to be closed and returned to pasture. It is a hillside site and, according to its design, will improve the contour and its usage for farm purposes once the project ends and all of the area has been graded and reseeded.

The landfill proposal, as conditioned by requirements imposed by the district environmental commission, passed muster with the Agency of Environmental Conservation and presumably satisfied all of the tests applicable under 10 V.S.A. § 6086(a). That Agency is also responsible for supervision of the operation of the landfill, to insure that all of the conditions imposed on the granting of the permit are met and that the operation is being conducted in accordance with the plan submitted. Under the conditions of the permit, the Agency has the authority to close down the landfill operation if it is out of compliance. See 10 V.S.A. § 6090(b).

The trial court took testimony as to all of the substantive issues involved in connection with the land use permit before the district environmental commission and the applications for site plan approval and for a conditional use permit before the appropriate agencies of the Town of Wallingford. Under 10 V.S.A. § 6086(a), state law specifies ten categories requiring affirmative findings before a district commission may grant a permit. Needless to say, the commission did so in this case before granting this permit.

The court carefully went through each of these substantive areas, insofar as they were applicable, and, as is appropriate

in a de novo proceeding, took evidence and made findings. It found all criteria satisfied except for 10 V.S.A. § 6086(a)(8) and (10).

10 V.S.A. § 6086(a)(8) requires that, before a permit can issue, it be found that the proposed development:

> (8) Will not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas.

Wildlife habitat, endangered species, historic sites or rare and irreplaceable natural areas are not involved in the project. The court concluded, however, that the proposed landfill will have an undue adverse effect on the scenic and natural beauty and the aesthetics of the area. In that connection, the court found that with proper screening the proposed project would not have an undue adverse effect on scenic or natural beauty, or the aesthetics of the area.

■ The findings reveal that the court's concern is based on two factors: first, the opinion of the court that the screening plan imposed by the district commission is not adequate, and second, an unsatisfied doubt that the Patches, due to lack of ability and experience, can successfully carry out the plan or some variation of it. These concerns persisted in spite of the evidence that the plan filed with the commission was specifically tailored to meet any such complaint, that the operation would remain under the supervision of the Agency of Environmental Conservation, and that, if the operation was marked by a failure to comply with the plan, the license to operate could be lifted by the Agency. The concerns of the trial court, in the face of the facts, are evidentially and legally insufficient as a basis to reverse the granting of the Act 250 permit, since they do not spring from any shortcoming or failure in the applicant's case but seem to be based on either conjecture or some unarticulated concept of unacceptability not set out in the requirements of the law.

With respect to the trial court's findings in connection with conformance with the Regional Plan, a requirement under 10 V.S.A. § 6086(a)(10), several problems arise. One finding establishes that under the Regional Plan a sanitary landfill is consistent with an agricultural zone, which is the situation here. Another finding says that the Rutland Regional Planning

Commission found the application to be in accordance with the Regional Plan in 1977, the date Clyde Patch filed for a land use permit application with the district environmental commission. As already noted, the permit was approved by the district commission.

The trial court found that there had been no change in the Regional Plan since then, but that there have been changes in the membership of the Rutland Regional Planning Commission. That finding also stated that the present planning commission would take no position on the matter either way without further study.

The court then appears to have made its own judgment of noncompliance based on its view of the meaning of the Regional Plan document, then in evidence before it. Aside from the finding that concludes that the landfill is not in conformity with the Regional Plan, the only finding on the court's view of the requirements of the Plan is based on the site's position near existing housing, and its potential to discourage the so-called Tarbell development to the south of the proposed site.

The insubstantiality of the Tarbell evidence as a "proposal of development" is discussed further in connection with the zoning appeal, later in the opinion. It clearly does not reach the posture of a valid potential residential development. An examination of the Regional Plan discloses a policy of encouraging sanitary landfill refuse disposal in language of even more compelling urgency than a policy against handicapping residential development. In reality, the purpose of the plan as stated in it is to provide guidance and direction to regional communities so that development in the area will be more cooperative and consistent. The implementation is a function of the adoption of zoning ordinances by municipalities, with the Regional Plan specifying general areas of use and facility location. To find from this plan that the specific location is barred by the mere possibility of residential development is to read too much specificity into the requirement of conformance and is unwarranted.

The Town contends on cross-appeal that the court should also have denied the Act 250 permit on the ground of 10 V.S.A. § 6086(a)(1)(B), which provides:

> A permit will be granted whenever it is demonstrated by the applicant that, in addition to all other applicable criteria, the development or subdivision . . . will not involve the injection of waste materials or any harmful or toxic substances into ground water or wells.

The Patches had the burden of proof of meeting this requirement. 10 V.S.A. § 6088(a).

The soil at the project site is classified as silt with 10 to 15 per cent clay. The court found that this type of soil is the best known for use in a sanitary landfill. There is at least ten feet of soil between the lowest planned level of refuse and the height of any ground water, the minimum depth required under state regulations.

The court found that the landfill will produce leachate, which it found to be a harmful and toxic substance. It found further that most of the harmful elements in the leachate would be removed, however, as it passes through the silty soil, and that they would become further diluted when they mix with the ground water. The landfill is also designed to minimize the amount of water that will percolate through the landfill.

The court found that the project would not result in undue water pollution, but did not explicitly find that the toxic substances would or would not enter the ground water. Implicitly it found that that would occur in its finding that the leachate would be further diluted before it reached the ground water. The court did acknowledge that there was a minimal possibility that pollution of wells might happen.

To provide for such an occurrence, the district commission required as a condition of the permit that the Patches post a $20,000 bond, payable to the Agency of Environmental Conservation. The Agency was to use this to provide new water systems for the abutting landowners if the Agency found that the landfill polluted their wells. A spring owned by the Patches would be used if a new water supply was needed.

The Town argues for a literal reading of § 6086 (a)(1)(B), and contends that, since the Patches have not shown absolutely that the project will not discharge toxic substances into the ground water, they should be denied a permit. We are not confined to a literal reading of the stat-

ute, however. See *In re Hatch,* 130 Vt. 248, 251, 290 A.2d 180, 182 (1972). The Town's interpretation would virtually preclude any landfills in the state, since contamination of ground water is always a possibility. The court found that most of the elements of the leachate would be removed as it passes through the soil and that the remaining substances would be diluted when it mixes with the ground water. As such, the court addressed the main concerns of subsection (a)(1), that the project not result in undue water pollution. The statute specifically requires the consideration of "the nature of soils and subsoils and their ability to adequately support waste disposal; . . . the availability of streams for disposal of effluents; and the applicable health and water resources department regulations." The court weighed those factors in making its determinations. We cannot say that, as a matter of law, the lower court erred in its findings.

Thus we find that the denial of the Act 250 permit on this record was error, and that the application for the permit was buttressed by a plan and evidence sufficient at law to require the granting of the permit. This decision brings us immediately to a review of the effect of the enforcement of the Wallingford zoning ordinance to bar the landfill.

In this proceeding, adjoining landowners do have party status under 24 V.S.A. § 4472(c), in contrast to appeals under Act 250, which denies that status to them under 10 V.S.A. § 6089(b). Certain of the adjoining landowners have joined in this part of the case and filed a brief in support of the ruling below.

At the outset of this issue it should be pointed out that no question has been raised as to the regularity of the adoption of the Wallingford zoning ordinance. If it has legal shortcomings, as far as this case is concerned, they are not related to its interpretation, application, or compliance with other law.

The ordinance establishes six different zoning districts in the town: (1) forest and recreational areas, (2) agricultural and rural residential areas, (3) residential areas, (4) multiple residential areas, (5) neighborhood commercial areas, and (6) industrial areas. Each of these areas has stated permitted uses. The forest and recreational and multiple residential zones have no other uses authorized except those specifically allowed

.in those districts. The remaining zones all provide for other uses upon a finding by the planning commission that the proposed use is of the same general character as those permitted in the zoning district and will not be detrimental to the other uses within the district or to the adjoining land uses. The agricultural and rural residential district, which is the district in which the proposed project is located, not only has defined permitted uses, but also has a list of specific uses that may be allowed upon the granting of a conditional use permit. But nowhere in this list of conditional uses, nor in any part of the entire ordinance, is there any provision relating to sanitary landfills.

One of the permitted uses in the agricultural district is "enclosed storage." One of the avenues by which the Patches sought to get their project authorized was to have the landfill considered a form of "enclosed storage." Neither the zoning board nor the trial court considered the landfill operation to fall within this use. Even the most plausible of the Patches' arguments on this point falls short of establishing any error in the rejection of this contention, and the correctness of that holding is so plain as to require no further comment.

The Patches also undertook to establish their right to a conditional use permit, but were unsuccessful in this, as well. However, their challenge to that ruling does require further examination.

Since a sanitary landfill operation is not among the specified activities eligible for a conditional use permit in this agricultural district, the zoning ordinance procedures require the establishment by the Patches of a number of standards. The first, already noted, is that the proposed use be of the same general character as those permitted in the district, and that the activity not be detrimental to other uses in the district or to adjoining land uses.

Beyond that, the ordinance also requires that the proposed conditional use not adversely affect: "(a) the capacity of existing or planned community facilities; (b) the character of the area affected; (c) traffic on roads and highways in the vicinity, and (d) by-laws then in effect." There is a further requirement that the use conform to the specific standards (regulations relating to lot size, frontage, building height, etc.)

for the district, but no issue is raised in connection with that requirement.

The trial court, after hearing the testimony, made findings on these questions. As to the effect on community facilities, traffic and bylaws, it found no sufficiently adverse effect to deny the use. It did find that there would be an adverse effect on the character of the area affected, however, and that there would be a detriment to adjoining landowners' use of their property. It went on to conclude, further, that a sanitary landfill was not of the same general character as the uses permitted in the district by the zoning regulations.

However, it is clear that the decision denying the conditional use permit did not turn on the test for similarity of character. The conclusions go on to say, in effect, that such a landfill could qualify for a permit under the ordinance if it was found not detrimental to other uses, either in the district or to adjoining land. Thus, the court was plainly turning its decision on the adverse findings as to impact on the character of the area and detriment to adjoining lands.

The result reached by the trial court was based on findings that determined that the ongoing project would be of unsightly appearance, with an increase in odor, noise and dust. The trial court also found that the presence of the operation would have an adverse effect on property values in the area, based both on the statements of adjoining property owners and the evidence that leachate from the dump might put individual water sources for such adjoining residents in some jeopardy.

The Patches attack each of these findings as unwarranted and unsubstantiated. They argue that there is no testimony in the case where any witness testified about the appearance of this landfill. They argue that the operating machinery is no more noisy than farm machinery and that any increase in traffic can be controlled by regulating hours and usage of the landfill. The Patches do acknowledge the possibility of some dust problem but claim that the evidence demonstrates that it will be controlled effectively so as not to be a problem of any substance. As far as the effect on any future development within the proposed ten-year life of the project, the Patches say that the only evidence of any such development

was so uncertain and speculative as not to be credible as a valid prospect real enough to deny the conditional use permit.

In reviewing the nature of the evidence on this issue it must be kept in mind that the concern involved in the matter relates to future actions or consequences. Although it is essential that there be a relevant and appropriate present state of facts from which these predicted consequences follow, there is an element of speculation, narrow it is hoped, to be expected in these sort of findings. It has its parallels in assessments of future damage from present tortious injury.

Looking at the total proposal, we have a pasture hillside set amidst farmland and forest that will be cleared of trees and stripped of grass and topsoil, and trenches cut into the hillside to hold compacted trash. Undeniably this changes the four acres involved into an area less sightly than a green Vermont hill. The evidence that dust control measures will be required, along with fences for blowing paper, is itself indicative that the landfill site will not be an attractive addition to the area. All of the descriptions of the efforts to be undertaken to minimize the odor and the noise from the equipment and traffic suggest, not that there is no problem, but rather that one would hope it can be minimized.

Perhaps of even more significance is the court's reference to the possibility of leachate reaching area wells. Although this might not happen, the evidence discloses the possibility, and it is not irrational to conclude that the very presence of this possibility threatens the value of some area properties, and will, until it is demonstrated that no such consequences will occur.

This is not the same question as was present in the Act 250 application. There the issue was whether the project reasonably took the prospect of actual contamination into account. Here the question is the effect on the value of adjoining lands based on the impact of suggested pollution. The trial court was well within the evidence in reaching the conclusion that property salability might well be adversely affected by a possible "cloud" on water supply. Here the court found adverse factors sufficient to justify the denial of a conditional use permit. Since this determination is supportable, it must be confirmed.

It is to be noted that, in reaching this result, we do agree that the evidence of the proposed "Tarbell development" was just too tenuous to be a factor in this decision. The owner of the property testified only that she might want to develop the property someday.

The evidence given by the landowners as to the probable impact of an operating landfill on the value of their own property was properly received under the statute. 12 V.S.A. § 1604. However, the evidence of transfers of land at assertedly increased prices was of such dubious relevance, particularly since it did not deal with general inflation of property values and assumed a knowledge of the prospective landfill, that it was properly within the discretion of the trial court to exclude it. *Long* v. *Leonard,* 113 Vt. 258, 261, 32 A.2d 679, 681 (1943).

It should be noted, however, that the evidence upon which the lower court's decision rests includes factors other than aesthetic. For that reason, in spite of the extended argument on that point, this simply is not a case involving that single issue, or even one in which to determine the effect of the standards set by the Legislature on the holding in the 1943 case of *Vermont Salvage Corp.* v. *Village of St. Johnsbury,* 113 Vt. 341, 351, 34 A.2d 188, 194–95 (1943).

The Patches, citing *Murphy Motor Sales, Inc.* v. *First National Bank of St. Johnsbury,* 122 Vt. 121, 165 A.2d 341 (1960), argue that, since the zoning regulations make no mention of sanitary landfills as either a permitted or forbidden use, such a use must be taken as eligible for conditional use consideration. Since that is one of the very issues this proceeding was all about, it comes as somewhat of a surprise to find that any party feels that such use is so ineligible as not to be even available to be present as a possible use. Nothing before us suggests that the denial by the court or the zoning authority was cast in terms of ineligibility for consideration.

The Patches also argue that *Murphy* governs the adjudication as to whether the sanitary landfill is of the same general character as may be conditionally permitted in the district, including a gravel pit. That contention is also

unsound. The *Murphy* case, as is pointed out by the Town of Wallingford's brief, dealt with a "prohibitive" type of zoning ordinance, that is, the unauthorized uses were listed, leaving all other uses authorized. *Id.* at 123, 165 A.2d at 342. This ordinance, by contrast, lists authorized uses; all others are prohibited unless they fulfill the conditional use tests as demonstrated by appropriate hearing. The trial court, hearing the matter de novo, properly evaluated the ordinance requirements and resorted to the requisite standards.

The Patches contend, with respect to the zoning ordinance as adopted, that the article establishing the agricultural and rural residential district is inconsistent with the authorizing statute. They point to what they contend are two discrepancies which they argue make the ordinance unenforceable and invalid.

The first relates to the description of the agricultural and rural residential district. The statutory section, 24 V.S.A. § 4407(1)(A), allows the establishment of such districts "permitting all types of agricultural uses, and prohibiting all other land development except for residential lots of not less than twenty-five acres each."

The Wallingford ordinance does not define its agricultural and rural residential district that way. It does not restrict the district only to all types of agricultural uses and residential lots of not less than twenty-five acres. Instead, it permits residential lots with a one acre minimum and permits, on lots of a minimum size of two acres, such uses as commercial outdoor recreation, forest uses, community centers, motels, hotels, hospitals, cemeteries, and others. Other uses are permitted conditionally.

From this the Patches argue that the Wallingford ordinance exceeds the authority given in the enabling legislation. Although this might appear to be so, a careful reading of 24 V.S.A. § 4407(1)(A) discloses that the language is permissive, and is by way of settling the restrictive limit on such a district, given the pressures of urban or suburban growth or a purpose to encourage such development in a different part of the community. The statute is no obstacle to a more liberal version of the district. 24 V.S.A. § 4405 makes specific authorization in that direction, and nothing

else demonstrates the ordinance to have gone beyond the statutory authorization.

The Patches also point to the provision of the ordinance that injects the planning commission into the consideration of conditional use permits. The ordinance provides for a finding by the planning commission that the proposed use is of the same general character as those permitted and which will not be detrimental to other uses within the district or to the adjoining land uses.

This, contend the Patches, violates the provision of 24 V.S.A. § 4407(2) which designates the board of adjustment as the body to decide upon and approve conditional use permits. It is the Patches' position that this ordinance makes an unauthorized delegation of power to the planning commission and, under the authority of *Town of Westford* v. *Kilburn*, 131 Vt. 120, 126, 300 A.2d 523, 527 (1973), makes the ordinance invalid.

The Town argues that if this is a flaw in the ordinance, that the solution is to sever the offending statement and leave the ordinance in force. We are not persuaded that such drastic surgery is required. The ordinance very carefully retains in the board of adjustment the only authority to grant approval for the issuance of conditional use permits. It is required to hold hearings and make findings, as required by 24 V.S.A. § 4407(2). Unlike the situation in *Kilburn*, the interjection of the planning commission into the investigatory process is not the involvement of an unofficial private group of landowners, but the minor engagement of a municipal body responsible for the preparation of this very ordinance, and a body with statutorily recognized functions in connection with these very permits. 24 V.S.A. § 4325. The ordinance is not thereby made invalid.

The Patches raise a constitutional argument with respect to the zoning ordinance. It is their claim that the Wallingford ordinance is unconstitutionally discriminatory in that it treats persons similarly situated differently without any reasonable basis related to any general public good. This contention comes before us without any factual record, nor do the proceedings below show that any evidence was taken on this issue.

Thus, the only available consideration the question can be given here is to examine the matter to see if the claim of discrimination is so supportable on the face of the matter to require disposition as a matter of law. Such a decision requires that the presumption of validity of an ordinance be overcome, *City of Burlington* v. *Jay Lee, Inc.,* 130 Vt. 212, 214, 290 A.2d 23, 24–25 (1972); that the demonstration of unconstitutionality clearly establish its unquestioned infringement of paramount law, *Village of St. Johnsbury* v. *Aron,* 103 Vt. 22, 27, 151 A. 650, 652 (1930); and that, as a zoning enactment it is unreasonable, irrational, arbitrary or discriminatory beyond dispute, *City of Rutland* v. *Keiffer,* 124 Vt. 357, 367, 205 A.2d 400, 407 (1964).

An examination of the ordinance reveals no such egregious shortcomings. The permitted uses relate to agriculture, forest and recreational uses, and uses related to residences or dwellings. The conditional uses go somewhat beyond the classifications and therefore require examination by the board of adjustment as to their effect on existing uses in the district. The Patches contend that some of those uses would have greater impact than the sanitary landfill, but we are without factual evidence that this is so, particularly to the point of making it unconstitutionally discriminatory, and it certainly is not apparent as a matter of law. This challenge to the ordinance is not sustained.

A question remains. The Patches would cast the controversy in the posture of a conflict between the preemptive exercise of state power and the attempted forestalling of that exercise by resort to the local ordinance. It is certainly true, and has several times been said that, in such a controversy the state policy requires the local authority to give way. *Kedroff* v. *Town of Springfield,* 127 Vt. 624, 256 A.2d 457 (1969).

There is no doubt but that such a doctrine of preemption must be carefully invoked. This, in particular, is the place for the close exercise of our general duty to construe laws so as to harmonize and give effect to each, if they can be viewed so as to operate without conflict and without compromise as to the purpose of the superior enactment, in this case state law.

Preemption usually must be invoked when the local law is a barrier to what the state has required to be done, or allows what the state has said must be prohibited. The conflict must be more completely head-on than is found in this case. See *City of South Burlington* v. *Vermont Electric Power Co.*, 133 Vt. 438, 446–47, 344 A:2d 19, 24 (1975).

Wallingford, through the operation of its zoning ordinances, has said only that a sanitary landfill cannot be operated in this district, in this location, based on the Patches' proposal. It has not acted to prohibit sanitary landfills elsewhere in Wallingford, nor does the present statutory scheme of such waste disposal as enacted by the state require each town to operate such a facility. Thus, unlike the *Kedroff* situation, the municipality is not acting under a required mandate from the state.

Here the state statutes contemplate a variety of solutions, including cooperation, action with another unit of government, or agreement with a private operator who has a state permit to operate. 24 V.S.A. § 2202a(b). This statute replaced the mandatory language requiring permits to issue for dumps that were in force and which dictated the result in *In re Town of Shelburne*, 128 Vt. 89, 258 A.2d 836 (1969). That being so, there has been no basis shown for the application of the preemption doctrine.

Thus, although the standards were met to sustain the application for a land use permit, and its denial was improper, the zoning permit ruling is sustainable. This means that in the present posture of the case the Patches are not authorized to carry out the proposed landfill authorization, as the original judgment provided.

*The order denying the land use permit to Clyde M. Patch is reversed and the permit may issue; the order denying the application of Clyde M. and Marlene Patch for a zoning permit is affirmed. Each party to bear its own costs in this Court.*