STATE OF VERMONT

ENVIRONMENTAL COURT

In re: Appeals of Robert Waite   }
and Diane Welebit               }
                                }  Docket Nos. 139-6-00 Vtec
                                }  and 183-8-00 Vtec
                                }
                                }
                                }

Decision and Order

In Docket No. 139-6-00 Vtec, Appellants Robert Waite and Diane Welebit appealed from a decision of the Planning Commission of the Town of Sunderland approving the site plan of Appellee Applejack Art Partners, Inc. In Docket No. 183-8-00 Vtec, Appellants appealed from a decision of the Zoning Board of Adjustment (ZBA) dismissing their appeal from the Zoning Administrator's grant of a building permit to Appellee. The appeals have been consolidated. Appellants are represented by David L. Grayck, Esq.; Appellee is represented by Neal C. Vreeland, Esq.; the Town is represented by Robert E. Woolmington, Esq.

An evidentiary hearing was held in this matter on March 27 and April 3, 2001, before Merideth Wright, Environmental Judge, who also took a site visit with the parties. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, the site visit, and the written memoranda and proposed findings, the Court finds and concludes as follows.

The project is proposed for two contiguous parcels of land on the south side of Route 7A in the Roadside Commercial zoning district. The parcel fronting on Route 7A, on which the development is proposed, contains 7.5 acres of land, of which approximately 4.9 acres is meadow land and the remaining 2.6 acres, bounded on the south by the Battenkill River, is wetland. The second parcel of 15 acres lies to the south of the Battenkill River and is to be conserved through the Friends of the Battenkill, and is not proposed to be developed. Residential and undeveloped parcels are adjacent to the conservation parcel, with the residential Hill Farm subdivision (off Hill Farm Road south and west of the project) from which a view was taken back towards the project site being located approximately 900 feet away.

The development parcel contains a house, barn, and smaller outbuildings in poor condition, which are proposed to be demolished, with appropriate historic documentation of the buildings during demolition. The parcel also contains a so-called 'farm dump' just over the river bank, which Appellees propose to clean up in connection with this project.

Appellants own adjacent property to the east, on which their residence is located. Their residence will have a view of the east side of the proposed buildings, including the parking lot and loading

dock. Appellant Diane Welebit operates a home occupation upholstery business from one room in Appellants' house. The business displays a small sign in the front yard.

The adjacent property to the west contains a retail business, Basketville, catering to the retail tourist trade, with a parking area for tourists cars adjacent to Route 7A. The entrance to Skyline Drive, the commercial toll road to Mount Equinox, is located almost directly across Route 7A. Other retail or commercial businesses are located in the area along Route 7A corridor, including a retail business, " The Old Game Shop," to be opened in a building across the road from the proposed project.

Description of Proposed Project

Appellee proposes an office and retail facility with distribution warehouse and parking, to be built on the 4.9 acre non-wetland portion of the front parcel. The Court makes no finding regarding later phases of the project; they are not before the Court as no application for subsequent phases was before the municipal bodies in the proceedings appealed from.

In the present proposal, Appellee proposes to construct two buildings on the property: an office and retail building, with a small parking area in front of the building, and a distribution warehouse building behind it, with a large parking area on the side and truck access to the distribution warehouse building. A total of 65 parking spaces are proposed. The proposed hours of operation for everything but the retail space in the front building are proposed to be from 8:00 a.m. to 6:00 p.m. Monday through Thursday, and until 5 p.m. on Friday. Only the retail gallery (alone) will be open on the weekends.

The front building, designated as " office/retail" on the plans, has a footprint of 10,000 square feet on two stories, with a total of 20,000 square feet of floor area. The attached rear building, designated as " warehouse" on the plans, is a single story structure with a footprint of 12,000 square feet. The buildings are located at a somewhat lower elevation than Route 7A, and so will appear less obtrusive from the road. Both buildings are designed as pre-engineered steel structures; however the front building is enclosed in a clapboard facade on three sides, with a wraparound porch, and is designed to be in the style of an early 20th-century Vermont mill. The rear building has a conventional standing seam roof and a sculptured steel siding on its rear and west sides. On the east side, facing Appellants' property, Appellee now proposes to extend the exterior clapboards from the office/retail portion to cover the side of the warehouse building. As designed, the proposed buildings will be attractive and compatible in style and appearance with the development on Route 7A in the immediate neighborhood.

Access from Route 7A onto the site is by a driveway approximately 120 feet in length, and sloping gently down towards the parking area. Parking is provided in two lots for a total of 65 vehicles, an adequate parking lot for the number of employees and the proposed retail space. Truck delivery access to the distribution warehouse building is provided on the east side of the building.

Sewage disposal and water supply are on-site, have received the required state approvals, and are adequate for the proposed use, and meet the standards of § 8.2 for the protection of streams and

drainage ways. The septic disposal fields are located approximately 165 feet at their closest point to the top of the bank which leads down to an existing wetland, well in excess of the 50-foot isolation distance required. The sewage disposal and domestic water supply are to be installed in soils ideally suited for that purpose, and will not drain towards or adversely affect Appellants' property or their own water supply. Telephone and electrical utility service to the buildings are provided underground. The proposed business sign meets the standards of § 6.15 of the Zoning Bylaws.

The footprint of the two buildings occupies 22,000 square feet, which amounts to 7% coverage of the 7.5-acre building site (or 10% of the 4.9 acres of buildable area if the 2.6-acre wetland is excluded) and is substantially less than the 25% coverage allowed by § 6.16. All lot size and setback requirements of § 6.16 are met by the proposal.

Appellee's Business Functions

Because a primary legal issue in this case is whether the proposed use qualifies as a permitted use in the Roadside Commercial District, and because one legal argument is whether any of the proposed uses are accessory to a permitted use, we must analyze Appellee's business functions more closely than in many other permitting cases.

Appellee publishes, sells and distributes limited edition artists' prints and art posters, and licenses art images to others. Appellee also buys and sells the valuable original paintings and artwork in other media from which the limited edition prints are made. At present, sales of original artwork are made as consignment sales through art galleries; however, Appellee proposes to sell original artwork from the gallery space in its proposed facility.

At present Appellee operates from leased space in Manchester, Vermont. It formerly operated a retail sales store and frame shop in downtown Manchester; however, it previously had discontinued that store, preferring not to manage an off-site operation. Appellee proposes to carry on its present activities in the proposed buildings, to reopen its retail framing business, and to sell original art at retail from the proposed front building. The gallery is estimated to generate 50 retail visitors per weekday and 200 per weekend. Appellee also proposes to rent out a portion of the front of the building space, designated as Room 109 "Rental Space" for an undefined retail use.

Approximately sixty percent of Appellee's present business revenues comes from the publication, sale and distribution of unsigned art posters, ranging in size from small cards through medium-sized prints to very large posters, and from the publication, sale and distribution of limited-edition lithographic prints which are signed and numbered by the artist. Appellee publishes approximately 350 new works each year. Limited-edition prints typically are produced in an edition of 1000 prints. Unsigned prints and posters may be produced in a run of several thousands to as much as 500,000 pieces. Appellee distributes millions of pieces of art prints and posters each year. Both the posters and the limited-edition prints are produced from original artwork by well-known artists; Appellee is particularly known for its wildlife artists. Artists are paid royalties based on sales by Appellee.

No printing of any artwork is done on the premises; all such operations are performed by independent offset printers and lithographers at various locations within and beyond Vermont. Consequently, Appellee's business operations produce no noise, fumes or exhaust, or hazardous chemical emissions into the air or water or onto the land.

The finished artwork is typically shipped by the printer to Appellee's distribution warehouse, where it is stored as inventory. It is packaged by Appellee's shipping department according to the wholesale customer's order and is shipped out to the customer. Very large orders going to a single customer are generally shipped directly from the printer to the customer in palletized form, a practice referred to as "drop shipment," and are not taken to or stored as inventory at Appellee's distribution warehouse. The art poster inventory occupies bulk storage space; the limited edition prints are stored in flat files to preserve their higher value. Customers are typically art galleries, frame shops and poster dealers.

The limited edition prints and art posters are delivered to Appellee from the printers in box vans, not 18-wheel tractor-trailers. Shipments from Appellee's distribution warehouse to its art dealer and gallery customers are made by UPS and Federal Express, which pick up shipments twice a day in box vans. Occasionally shipments are made through the U.S. Postal Service. Packing materials for these shipments, consisting of cardboard boxing and cardboard mailing tubes, arrive by 18-wheel tractor-trailer trucks on an average of two truck trips per week. The application describes two such truck trips a day, but although two could arrive on a given day, the number of tractor-trailer truck trips averages to two per week.

Approximately forty percent of Appellee's present business revenues comes from its licensing to independent manufacturers the right to reproduce images of artists' paintings, photographs or other artwork on articles such as jigsaw puzzles, calendars and greeting cards. Appellee maintains an inventory of archived films of artwork and digitized copies of artists' work stretching back 50 years. The right to use these images is sold to manufacturers under license agreements. The manufacturers create, manufacture and sell their own products from their own facilities, and then pay royalties to Appellee based on volume of those sales. For example, Appellee acts as the exclusive art licensing agent for the National Wildlife Federation, and licenses images used by licensees such as The Bradford Exchange and the Danbury Mint. Appellee represents about two hundred artists at present, and licenses approximately 500 works annually.

The primary work to be conducted in the front building involves the acquisition of original art or rights to original art from the artists; the capture of images of that art by traditional or digital photography, and its storage on film or digital media; telephonic and email sales, communications, and negotiations with artists under contract and with a network of art galleries and art dealers throughout the United States, Canada, Australia and Great Britain (with the possibility of expansion to other countries); and telephonic and email sales, communications, and negotiations with third party manufacturers throughout the world for the licensing contracts for artwork on items to be produced and sold by such third parties. This work relies heavily on computerized graphic arts and digitized imaging, telecommunications, computerized accounting and royalty records management, and requires an administrative office staff for sales and royalty accounting.

Appellee's staff consists of the following fifty people, who will continue to be employed in these functions in the proposed new facility[1]: Four people in management; seven people in the graphic arts department; twenty-one people on the sales staff, of which seven people work on marketing the licensing of art images, and fourteen people work on marketing limited edition artists' prints and art posters; ten people doing clerical work in accounting, reception and as administrative assistants; six people whose responsibilities pertain to the receiving, storage of inventory, and shipping (which may include the person who frames the artwork, see footnote 1) and two people doing maintenance for the facility. Appellee has not stated whether any additional employees of the front room lessee will serve space designated on the plans as rental space.

Appellee entertains visits by its artists, art dealers, and other persons with whom it does business, at a rate of approximately one visit per week. In the new facility, this function is proposed to include use of the gallery space to demonstrate to art dealers techniques for the display, framing and exhibition of limited edition artists' prints and art posters for sale.

Space allocated to each function in the proposed buildings

The entire second floor of the front building, approximately 10,000 square feet, is allocated to office functions, consisting of office space for the management, sales, accounting, licencing and art departments, and associated conference rooms, and employees kitchen/lounge and toilet facilities, as well as the stairways and elevator necessary for the mechanical functions of the building.

The first floor of the front building, approximately 10,000 square feet, is allocated to the following uses. Allocations are approximate as to square footage, as the exhibits included only reduced size versions of the plans, and both parties argued for somewhat different allocations than found by the Court. The room numbers are shown for all numbered spaces.

The entry lobby (101), gallery[2] (102) and rental space (109) are allocated to the retail use, for a total of approximately 3300 square feet.

The reception desk, kitchenette (114), employee gym (106), showers and toilets, photo shop (104)and vault (107) are allocated to the office use. For ease of calculation, we will also allocate to the office use the stairways, elevator, utility room, and machine room necessary for the mechanical functions of the building (as most of that space is made necessary by the presence of the second floor, which is allocated to office use). The space allocated to office use on the first floor is thus a total of approximately 2784 square feet. The vault shown as Room 107 will be used to store the original art to be sold in the gallery and from which the films and digital media representing Appellee's archives of artwork are produced; a second vault not shown on the plans, to be located within the distribution warehouse, will be used to store those archives. The photo shop is where the film or digital photography of the artwork is done.

The frame shop (103), 916 square feet in area, is split between the retail use and the distribution warehouse use. Approximately half the frames made there will be for retail framing customers and for the original artwork to be sold in the gallery, the remainder for the artwork to be shipped to dealers and galleries in connection with the distribution of limited edition artists' prints and art

posters. Appellants argue that it is a manufacturing use not allowed in the district at all. We find that the production of frames to order for retail customers does not fall within the use category of 'manufacturing' but instead falls within the use category of a 'retail service occupation' (§ 6.13.4), which may include manufacturing or processing incidental to that use. It is a retail service use in itself for the framing of customers' own artwork, and is also accessory to the retail sale of artwork from the gallery. The production of frames in connection with the distribution of the limited edition artists' prints and art posters is similar to the packaging of unframed artwork. It is allowed as a use, but only in connection with and only if the distribution warehouse function is allowed as a use. Accordingly, for the purposes of this analysis, we will allocate approximately 458 square feet of this space to each of the retail and the distribution warehouse uses.

The remainder of the first floor of the front building (108), approximately 3000 square feet, is used for the storage of the inventory of limited-edition prints. It is allocated to the distribution warehouse use.

Of the 12,000 square feet of the distribution warehouse, 9080 square feet will be used for storage of the inventory of poster art. A second vault space, not shown on the plans, is proposed to be located within the warehouse for the storage of the films and digital media representing Appellee's archives of artwork. This vault space was described in evidence only as "larger" than the vault shown as Room 107. For the purposes of this discussion, we estimate it at twice the size of the other vault, or 400 square feet, which is allocated to office use. The remainder of the distribution warehouse space will be used for shipping and receiving and for the storage of the cardboard packing materials (flat boxes, interleaving cardboard, and mailing tubes) used in preparing shipments. Some larger shipments are prepared for shipment on pallets, on which the shipments are kept together by being wrapped in wide plastic film. All of this space except the vault is allocated to the distribution warehouse use, for a total of 11,600 square feet allocated to the distribution warehouse use.

Accordingly, of the 32,000 square feet of the floor space of the proposed buildings, approximately 13,184 square feet, or 41% will be used for the office use, a permitted use in the district; approximately 3,758 square feet, or 12% will be used for the retail use, a permitted use in the district; and approximately 15,058 or 47% will be used for the distribution warehouse use, which is not a listed permitted use in the district. Therefore, to allow the distribution warehouse use, it must qualify either as an accessory use under § 6.14, or functionally similar to a listed permitted use under § 6.13.9.

<u>Whether the project is a permitted use in the Roadside Commercial district</u>

The permitted uses in the Roadside Commercial zoning district include eight categories of listed permitted uses, plus a ninth category of uses 'similar to a permitted use.' Section 6.14 allows "accessory uses customarily incidental to a permitted use." Appellee has applied under § 6.13.3: 'business or professional offices . . .' and under § 6.13.4: 'retail business or retail service occupation,' for the building space allocated to office uses and retail uses as described above. Appellants argue that the Appellee's office functions cannot be carried on without the distribution warehouse, that the distribution warehouse functions cannot qualify as a permitted use, and that therefore the office functions cannot be permitted either. However, the Sunderland

Zoning Bylaws do not require such a conclusion. Rather, we consider whether the distribution warehouse functions are authorized within any of the permitted use categories, or as an accessory use to the permitted uses.

Appellee argues in the alternative that the distribution warehouse functions are permitted as an accessory use under § 6.14 or as a use similar to a listed permitted use under § 6.13.9.

While one might argue that a distribution warehouse is customarily incidental to carrying out the 60% of Appellee's business that is the wholesale art publishing business, it is more difficult to say that a distribution warehouse is customarily incidental to carrying out merely the office functions of that wholesale business. Rather, both are essential component parts of the wholesale business. Further, the definition of "accessory use" also requires that the use be subordinate to the principal use. Although the number of employees performing the distribution warehouse functions is smaller than the number of employees performing the office and retail functions of Appellee's business, in no other sense can the distribution warehouse functions be considered subordinate to the remainder of the business. It occupies more of the floor area of the proposed buildings than the permitted uses, and is an integral part of Appellee's business. We conclude that the distribution warehouse use does not qualify as an accessory use under § 6.14 to either the permitted office use or the permitted retail use.

Section 6.13.9 allows as a permitted use in the Roadside Commercial district "[a]ny use which the Planning Commission finds to be similar to a [listed] permitted use in its effect upon the character of the vicinity, traffic, and the emission of noise, vibration, odor, smoke, dust or glare, and its effect on the value of adjacent[3] property."

Appellants first argue that the Planning Commission lacks authority to perform this function, that somehow the Sunderland Zoning Bylaws improperly assign a type of conditional use review, which should be the function of the ZBA, to the Planning Commission. While it is true, as we noted in the summary judgment decision, that the Sunderland Bylaws are unusual in not requiring conditional use review in this district, the Bylaws do require conditional use review in other districts, in which the task is properly assigned to the ZBA. The Planning Commission's task under § 6.13.9 is not a disguised conditional use approval.

Rather, the Bylaws assign two separate tasks to the Planning Commission in the context of this case, and it is important not to confuse or conflate those two tasks. One task is that of Site Plan Review, which the parties do not dispute is within the province of the Planning Commission. The other task is to determine whether a particular use category, not listed as a permitted use, nevertheless should be classified as a permitted use in the district because it is similar to the listed permitted uses. It is well within the authority of a planning commission to determine whether a particular use fits within a particular use category. In re Patch, 140 Vt. 158, 175 (1981); and see Simendinger v. City of Barre, Docket No. 1998-144

(Vt. Supreme Ct., January 8, 2001) (slip op. at heading III). It is, after all, the Planning Commission's task to draft those use categories in the first place. Nothing in the zoning enabling act assigns this function to the ZBA or development review board. Under 24 V.S.A. § 4325(3), any planning commission may "[a]dminister bylaws adopted under subchapter 6 of this chapter,

except to the extent that those functions are performed by a development review board. Accordingly, § 6.13.9 is within the purview of the Planning Commission, and hence this Court on appeal.

For the distribution warehouse to qualify as a permitted use under § 6.13.9, we must compare its effects upon four criteria to the effects on those criteria of any of the listed permitted uses. Section 6.13.9 does not require a finding that the proposed use have no adverse effect on the four criteria, nor does it require that the proposed use have any less adverse effect than the listed uses. Rather, it requires that the Planning Commission, and hence this Court, find that the proposed use is <u>similar</u> to any of the listed uses regarding the four criteria.

The other permitted uses include (1) public and semi-public uses such as power plants, state institutions, public and private schools, churches, convents and parish houses; (2) uses permitted in the Rural Residential district; (3) business or professional offices, and financial institutions; (4) retail business; (5) a hotel or motel; (6) restaurants, diners and catering operations (not including drive-through restaurants); (7) commercial or public recreation, sports or cultural facilities such as a theater or health center; and (8) automobile service station; public garage; or automobile, boat, trailer or farm equipment salesroom. Thus, uses such as a school, a courthouse, a larger office building, a bank, a restaurant, a sports club, a movie theater, an automobile service station, or a vehicle or farm equipment dealership could be located on Appellee' s property as a permitted use.

The effect of Appellees' 15,000-square-foot distribution warehouse on the character of the vicinity is similar to that of several of the listed permitted uses. It has been designed to blend with the visual character of the vicinity at least as much as a similarly-sized retail business, courthouse, motel, school or office building, and better than a vehicle or farm equipment dealership, movie theater, automobile service station, or retail supermarket. The movement of vehicles onto, from and around the site would have a similar effect on the character of the vicinity as a similarly-sized retail business, vehicle or farm equipment dealership, or automobile service station, considering the numbers of passenger vehicles, vans, and tractor-trailer vehicles likely to visit the site.

The effect of Appellees' 15,000-square-foot distribution warehouse on traffic is similar to that of several of the listed permitted uses. A permitted office use could occupy up to 53,000 square feet on the site, on two floors with lower level employee parking, and could accommodate twice the expected number of employees, which would generate a comparable or greater level of employee passenger vehicle traffic and a comparable or greater level of UPS and Federal Express traffic. A restaurant, motel, courthouse, supermarket, movie theater or school use would generate a comparable or greater level of passenger vehicle traffic at certain times of the day. A vehicle or farm equipment dealership, or automobile service station, would generate a comparable or greater level of tractor-trailer vehicle traffic.

Appellees' 15,000-square-foot distribution warehouse will not emit any noise, vibration, odor, smoke or dust, other than the noise of the vehicles using its parking lot and loading dock, which is similar to that of several of the listed permitted uses as discussed above. Its exterior lighting is

designed so as not to emit any glare. Accordingly, it is similar in these respects to an office use, school, courthouse, motel, or sports club.

The effect of Appellees' 15,000-square-foot distribution warehouse on the value of adjacent property is similar to that of several of the listed permitted uses. The adjacent properties are the Appellants' property, the Basketville property, the Skyline drive entrance across the road, and either the conservation parcel of Appellee's property across the river, or the residential properties adjacent to or nearby that property. The Court took a view of the project site from a residential property in the Hill Farm subdivision across the river, and finds that the proposed project would be visible from that location through the trees, which in the summer would largely obscure the view of the site, but that even with an unobscured view of the site, the presence of the two buildings and the activities in the proposed parking lot would be unobtrusive when viewed from that distance, and would have no measurable effect on their property values. While the retail aspects of Appellee's project could have a positive effect upon the adjacent Basketville property, by bringing more tourists and their economic activity to the area, we must restrict this analysis to the distribution warehouse, which is the use being analyzed under § 6.13.9. The effect of the distribution warehouse on the value of adjacent property is similar to that of an office, a large retail business, a sports club or a motel, that is, to any of the uses with an employee parking lot, daily UPS, Federal Express and U.S. Mail deliveries, and occasional limited tractor-trailer service, and no use of hazardous chemicals or emissions of fumes, gases or other emissions. It would have a less adverse effect upon the value of Appellants' property than, for example, a vehicle or farm equipment dealership with repair or servicing facilities, or a motor vehicle service station.

Accordingly, the distribution warehouse constitutes a permitted use under § 6.13.9, and may be considered for site plan approval together with the office and retail uses for Appellee's proposed project.

Whether the project meets the site plan approval standards

As we noted in the February 21, 2001 summary judgment order, conditional use approval from the ZBA is not required in this district for any of the permitted uses. The project requires Site Development Plan approval by the Planning Commission under §§ 6.11 and 3.6, including the determination of compliance with the performance standards of § 7.18.

Upon reviewing each of the applicable standards, the Court concludes that Appellee's proposal meets the standards of § 7.18.

Light - The exterior lighting proposed for the project will direct artificial light away from adjacent lots and public ways. The pole-mounted light fixtures are designed to a maximum height of 16 feet, well within the 25-foot limit. The lights will be equipped with timers and will be shielded particularly to prevent illumination of or glare onto Appellants' property.

Noise - As a use with no manufacturing or noise-producing machinery, the proposed project will not produce noise in excess of the maximum allowable 65 decibels level between the hours of 7:00 a.m. and 10 :00 p.m. and will not exceed 60 decibels during the remaining hours. The office

and distribution warehouse uses will occur from 8:00 a.m. and 6:00 p.m.(or 5:00 on Fridays) on weekdays only. Only the retail uses will be open on the weekends. The only anticipated noise from the project will be the sound of the normal building mechanical systems (that is, the heating, ventilating and air conditioning equipment) and the normal pedestrian and vehicular traffic. The loudest expected vehicular noise would be the occasional tractor-trailer truck proceeding on the driveway at very low speeds. We note that the driveway entrance is located approximately 55 feet farther from Appellants' residence than is the traveled way of Route 7A.

Vibration - As a use with no manufacturing or vibration-producing machinery, the proposed project will not produce vibrations to be transmitted through the ground or detectable beyond the property lines. The normal building mechanical systems (that is, the heating, ventilating and air conditioning equipment) should not produce detectable vibration.

Dust, Fumes, Vapors, Gases and Odors - As a use with no manufacturing and especially no printing processes on site, the proposed project will not produce dust, fumes, vapors, gases or odors. The normal building mechanical systems (that is, the heating, ventilating and air conditioning equipment) should not produce detectable emissions; they are located on the roof, hidden from view, and are designed merely to provide heat exchange.

Water Quality - The project is designed to avoid any adverse impact on water quality and to protect the resource of the adjacent Battenkill River. Appellee's business involves no storage of fuels, toxic chemicals, industrial wastes, or any potentially harmful raw materials. The site plan provides for a fully vegetated buffer area between the developable land and the Battenkill River, to preserve its natural condition without any structures or site development for a distance of 210 feet.

Refuse Disposal - Refuse produced by Appellee's business will be removed from the site by the waste hauler which at present handles refuse removal at Appellee's existing location in Manchester. As it accumulates it will be stored in a dumpster, located adjacent to the rear of the parking lot and enclosed by a wooden fence, as shown on the plans. Appellee has an active recycling program, in particular for cardboard.

Explosive and Flammable Materials - Appellee's business does not employ or store flammable or explosive materials subject to this section.

Storm Water Run-off - The project is designed to handle stormwater runoff adequately, so that it will not flow onto Appellants' property and will not adversely affect the Battenkill River. The plans provide for grass-lined swales with shallow slopes for percolation of water into the porous soil, with any excess discharging into an energy dissipation structure to return the flow to overland sheet flow. Appellee has obtained approval of the erosion and stream protection aspects of its project in connection with its Act 250 permit. A state stormwater discharge permit is not required, since the stormwater will not discharging directly into any wetland, pond, or pristine waters and is not a contributor of pollutants.

Erosion Control - The project is designed adequately to handle erosion control during and after construction. The development site is predominantly meadow land with a shallow (4%) average

slope, containing sandy loam soil at the surface overlaying a course of sandy gravel, all of which is very permeable and absorbs stormwater well. Final seeding of the site with grass will prevent long-term erosion after construction is completed.

Parking and Access - The project is designed to provide adequate vehicular and pedestrian access to the site, with a 21-space parking lot, including handicapped parking, close to the front or retail space of the building, and a 44-space lot on the side to accommodate most employee parking, for a total of 65 spaces, with truck access to the distribution warehouse on the side of the building. The parking provided for the project meets the requirements of § 8.14.

Screening and Landscaping - With the additional 18 trees placed on the amended site plan in evidence as Exhibit 12, the site plan provides adequate screening and landscaping for the project. In addition, the site is designed at a lower floor elevation than the roadside elevation, so that the buildings will appear to be integral with the topography and the planted screening will be more effective. The screening is designed to provide a continuous buffer with a minimum width of 35 feet, except for the driveway access. It is to be planted with grass and trees, the latter to be set back a sufficient distance to prevent blocking traffic visibility.

Similarly, the parking area in front of the retail portion of the structure will be set into the existing grade approximately three feet to enhance the effectiveness of the screening. The larger employee parking lot is adequately screened by a line of maple trees, along the main highway at the entrance driveway and around the perimeter of the parking lot on the north and west sides as well as in the center island of the parking lot. Similarly, the loading dock is adequately screened with Eastern Hemlock trees.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that site plan approval is hereby GRANTED to Appellee, on the same terms and conditions as ordered by the Planning Commission, and incorporating the terms and conditions of Act 250 permit No.8B0540, with the following additions:

1) the approved site plan shall be amended to show the 18 additional screening trees and the designation of the protection area for the septic system.

2) an average of two tractor-trailer trips per week (onto and off the site) may occur, averaged over a calendar month, not to exceed two tractor-trailer trips in any single day.

Appellant's appeal of the building permit is also denied, and the building permit may issue.

Appellee shall file with the Planning Commission a copy of the site plan as approved by this Decision and Order and showing the septic field protection zone and the additional proposed trees.

Done at Barre, Vermont, this 26th day of April, 2001.

_____
Merideth Wright
Environmental Judge

**Footnotes**

[1.]    Appellee has not stated that it will need to expand its staff to cover the frame shop and the retail gallery functions in the proposed location. Any additional staff numbers are only relevant to the sizing of the parking lots and the septic system.

[2.]    Appellants argue strenuously that the primary use of the gallery will be as an art showroom and training facility for Appellee's wholesale customers. The Court finds that, although that function will take place in the gallery as a secondary function for approximately one such wholesale customer per week, the gallery's primary function will be to display and sell original art to retail customers. This finding, in any event, is not dispositive of any of the issues in this case.

[3.]    Appellee appears to argue that all four of the criteria should only be measured in comparison to the effect on adjacent property. However, such an interpretation would make nonsense of the other three criteria. The plain language of the section only requires the valuation section to be limited to the adjacent property.